COLORADO COFFEE BEAN, LLC, a Colorado limited liability company; Double R Coffee, LLC, a Colorado limited liability company; MLT Taylor, LLC, a Colorado limited liability company; Peak Java Company, a Colorado corporation; JFK, LLC, a Colorado limited liability company; CZ–DM, Inc., a Colorado corporation; JKKR, LLC, a Colorado limited liability company; Peak Mountain Coffee, Inc., a Colorado corporation; King Soopers JM, Inc., a Colorado corporation; and ABC Sales, Inc., a Colorado corporation, Plaintiffs–Appellants,

v.

PEABERRY COFFEE INC., a Colorado corporation; Peaberry Coffee Franchise, Inc.; William I. Tointon; James T. Orr; and Perkins Coie, LLC, a Washington limited liability partnership, Defendants–Appellees.

No. 09CA0130.

Colorado Court of Appeals, Div. IV.

Feb. 18, 2010.

As Modified on Denial of Rehearing April 1, 2010.

Podoll & Podoll, P.C., Richard B. Podoll, Robert C. Podoll, Dustin J. Priebe, Greenwood Village, Colorado, for Plaintiffs–Appellants Colorado Coffee Bean, LLC; MLT Taylor, LLC; Peak Java Company; JFK, LLC; CZ–DM, Inc.; JKKR, LLC; Peak Mountain Coffee, Inc.; King Soopers JM, Inc.; and ABC Sales, Inc.

Law Office of D. Bruce Coles, P.C., Donald Coles, Denver, Colorado, for Plaintiff–Appellant Double R Coffee, LLC.

Wheeler Trigg O'Donnell LLP, Hugh Q. Gottschalk, Andrew M. Unthank, Denver, Colorado, for Defendants–Appellees Peaberry Coffee, Inc., Peaberry Coffee Franchise, Inc., William I. Tointon, and James T. Orr.

Rothgerber Johnson & Lyons LLP, Frederick J. Baumann, Hilary D. Wells, Denver, Colorado, for Defendant–Appellee Perkins Coie, LLC.

Campbell Latiolais & Ruebel PC, Casey A. Quillen, Denver, Colorado, for Amicus Curiae Colorado Civil Justice League.

Faegre & Benson LLP, Heather Carson Perkins, Jeffrey A. Brimer, Denver, Colorado, for Amicus Curiae International Franchise Association.

Hall & Evans, L.L.C., John E. Bolmer, Denver, Colorado, for Amicus Curiae American Association of Franchisees and Dealers.

Campbell Latiolais & Ruebel, P.C., Casey A. Quillen, Denver, Colorado, for Amicus Curiae Colorado Defense Lawyers Association.

Roberts Levin Rosenberg, PC, Bradley A. Levin, Denver, Colorado, for Amicus Curiae Colorado Trial Lawyers Association.

Opinion by Judge WEBB.

This case arises from plaintiffs' purchase of Peaberry Coffee franchises. Plaintiffs appeal pretrial orders striking their jury demands and bifurcating the trial. They also appeal the judgment entered following a bench trial dismissing all of their claims against defendants, Peaberry Coffee, Inc. (the parent company); its wholly owned subsidiary, Peaberry Coffee Franchise, Inc. (PCFI); William I. Tointon, the sole shareholder of the parent company and its chief operating officer; James T. Orr, the parent company's vice president of franchising; and Perkins Coie, LLP, franchising counsel to the parent company.[1] The judgment also awarded PCFI damages on counterclaims against seven plaintiffs.

We vacate the judgment dismissing plaintiffs' third claim against the Peaberry defendants to the extent that it alleged fraudulent nondisclosure of the parent company's historic losses, because we conclude that the trial court erred in treating integration and nonreliance clauses (the exculpatory clauses) in the transactional documents as precluding plaintiffs' reliance on nondisclosure of these losses. We also vacate the judgment in favor of PCFI on its counterclaims and the judgment dismissing the fraudulent nondisclosure and aiding and abetting fraudulent nondisclosure claims against Perkins Coie. However, inconsistencies in the court's findings and conclusions require that we remand for further findings on the viability of the fraudulent nondisclosure claims. The judgment is otherwise affirmed, as are the pretrial orders.

## I. Facts

Since 1990, the parent company or its predecessor has operated as a roaster, wholesaler, and retailer of gourmet coffee. It owned and operated up to 20 retail locations (the company stores) in and around Denver.

In 2002, Tointon decided to embark on a franchising program and hired Fred Nielsen, who served as president of the parent company from 2002 to 2005 but was not named as a defendant, to direct the program. The parent company retained Perkins Coie to form PCFI as franchisor and draft various documents, including the Uniform Franchise Offering Circular (UFOC), the contents of which are regulated by the Federal Trade Commission (FTC), and the franchise agreement. In 2003, Orr joined the parent company.

PCFI sold ten franchises between December 2003 and June 2004. Eight of the plaintiffs responded to a posting about franchise availability on the PCI website and bought franchises directly from PCFI. Each of them received a UFOC, testified that a principal understood it or had it reviewed by an attorney, and executed a closing acknowledgment along with a franchise agreement. Two plaintiffs bought franchises from an existing franchisee and succeeded to its franchise agreement. All franchise agreements are materially identical.

As relevant here, plaintiffs pleaded claims of fraudulent nondisclosure, negligent misrepresentation, alter ego, and violation of the Colorado Consumer Protection Act, sections 6–1–101 to –1120, C.R.S.2009, (CCPA) against the Peaberry defendants. They pleaded claims of fraudulent nondisclosure, negligent misrepresentation, violation of the CCPA, and aiding and abetting fraudulent nondisclosure against Perkins Coie. PCFI counterclaimed against seven plaintiffs to recover royalties under the franchise agreement.

In rulings based on a provision of the franchise agreement, an earlier trial judge struck plaintiffs' jury demand as to the claims against the Peaberry defendants, and the trial court ruled that the claims against Perkins Coie were triable to the court. During discovery, the Peaberry defendants asserted the attorney-client privilege as to all communications with Perkins Coie. The trial

---

**1.** Unless otherwise indicated, "Peaberry defendants" include the parent company, PCFI, Toin- ton, and Orr.

court rejected plaintiffs' challenge to the privilege based on the crime-fraud exception. Then the court bifurcated trial of the claims against Perkins Coie, reasoning that in a joint trial either the Peaberry defendants or Perkins Coie would be prejudiced, to the extent that Perkins Coie sought to use those privileged communications in its own defense.

According to plaintiffs, the Peaberry defendants sought to exploit a failed business model by selling franchises but fraudulently not disclosing that most of the company stores were unprofitable and the parent company had suffered significant financial losses each year. Plaintiffs emphasized that the defendants did not disclose any financial information about the parent company and disclosed only gross sales of the company stores. They also pointed out that franchisee information packets sent to them included an article, published by the *Denver Business Journal* in 2003, quoting Nielsen as saying that "Peaberry is profitable now," which the trial court found to have been false.

The Peaberry defendants presented the franchising program as legitimate based on evidence that the parent company's losses were related to its rapid growth, some company stores were profitable, and retail sales had increased in the years immediately before the franchising program. They primarily challenged plaintiffs' reliance based on the exculpatory clauses, wherein plaintiffs disclaimed reliance on representations other than as contained in the transactional documents. They also asserted that the "earnings claim" in Exhibit J to the UFOC, which included no financial information on the parent company and only gross sales of the company stores, complied with FTC regulations.

The bifurcation order provided that the claims against the Peaberry defendants would be tried first. At the conclusion of plaintiffs' case, the trial court dismissed the CCPA claim against all defendants under C.R.C.P. 41(b) for lack of public impact. Following trial, the court entered detailed written findings of fact and conclusions of law drafted by counsel for the Peaberry defendants, as edited by the court (the decision). The decision contains some inconsistencies between sections that the court changed and those which it did not.

The decision resolved all claims and counterclaims in favor of the Peaberry defendants. The court found that plaintiffs had failed to prove "PCFI was formed for a fraudulent purpose," and was "not persuaded that the Defendants embarked on a franchising program as part of a scheme to defraud Plaintiffs." It also found that Exhibit J "complied with the FTC requirements applicable to the earnings claim," and was "not otherwise misleading or deceptive." However, the court determined that the UFOC "does not provide a safe harbor against a common law fraud claim."

On the nondisclosure claim, the court found that "Peaberry actively concealed material financial facts from the Plaintiffs," of which plaintiffs were ignorant, and that "[t]he concealed facts were withheld with the intent that the Plaintiffs purchase their franchises ignorant of the true facts." Nevertheless, the court found against plaintiffs on reliance: as to losses at the company stores, because information from which profitability could be calculated was publicly available and based on language in the UFOC; and as to losses by the parent company, because the exculpatory clauses precluded reliance on any information outside the transactional documents.

The court entered a final judgment awarding PCFI breach of contract damages against seven plaintiffs, dismissing all remaining claims against Perkins Coie based on the decision, and awarding PCFI attorney fees under the franchise agreement, in an amount to be determined.

On appeal, plaintiffs challenge dismissal of their claims against all defendants for fraudulent nondisclosure and violation of the CCPA; dismissal of their alter ego claim against PCFI; dismissal of their negligent misrepresentation and aiding and abetting fraudulent nondisclosure claims against Perkins Coie; and the damages awarded to PCFI.

## II. Fraudulent Nondisclosure

Plaintiffs first contend the trial court erred in dismissing their fraudulent nondisclosure[2] claims based on the exculpatory clauses. Defendants respond that the trial court also found plaintiffs had failed to prove a duty to disclose. We conclude that the trial court erred in finding reliance as to nondisclosure of the parent company's losses was unreasonable based on the exculpatory clauses. However, because of inconsistencies in the decision concerning duty, we remand for clarification.

### A. The Trial Court May Have Found Facts Giving Rise to a Duty to Disclose

Plaintiffs submitted as Appendix A to the Opening Brief a document, which defendants do not challenge, consisting of the draft decision prepared by the Peaberry defendants and the edits made by the trial court.[3] When asked at oral argument, the Peaberry defendants did not dispute its accuracy. The court's changes indicate that it may have found a duty to disclose.

"The existence and scope of a tort duty is a question of law to be determined by the court." *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1193 (Colo.App. 2008). But the predicate facts must still have been found by judge and jury. *See Hesse v. McClintic*, 176 P.3d 759, 762 (Colo. 2008) ("We begin our review with the question of whether McClintic owed a duty of care under the circumstances."). Here, the court's changes would

be consistent with having found facts giving rise to a duty to disclose.

The decision consists of twelve lettered sections, some of which address only one element of different claims, while others address all elements of one claim. The court's most significant edits are in section H, which it retitled, "No Duty of Disclosure (Third Claim for Relief)." The court entirely rewrote subsection H(1)(b), "False Impression of the Facts," and deleted subsection H(2), "The Undisclosed Information was Not Material."

In rewriting section H, the court first deleted from the introductory explanation of why the nondisclosure claim failed, "because Defendants had no duty to disclose the disputed information and because the information was not material to Plaintiffs' decision to acquire a Peaberry franchise."[4] The Peaberry defendants' draft identified "three potential sources of duty relevant in this case," one of which was "where a defendant ... created a false impression in the plaintiff's mind." The court addressed this source of duty in subsection H(1)(b).

First, the court looked to CJI–Civ. 19:5(6) and Restatement (Second) of Torts § 551(e) for situations requiring disclosure. Next, the court quoted CJI–Civ. 19:1 for the elements of fraudulent nondisclosure.[5] The court's discussion of materiality, defendants' intent, and plaintiffs' ignorance is consistent with controlling case law. *See, e.g., Mallon Oil Co. v. Bowen/Edwards Associates, Inc.*, 965 P.2d 105, 111 (Colo.1998). But that discus-

2. Plaintiffs call this claim fraudulent concealment in their brief. Although often used interchangeably, *see* CJI–Civ. 19:2 ("Nondisclosure or Concealment—Elements of Liability"), to the extent that concealment suggests affirmative acts while nondisclosure connotes inaction despite a duty, we use "nondisclosure" because the trial court made no findings as to affirmative acts and plaintiffs do not identify any such acts.

3. The utility of and problems involved in trial courts' use of such drafts were addressed in *Coors v. Security Life of Denver Insurance Co.*, 91 P.3d 393, 398 (Colo.App.2003), *reversed in part on other grounds*, 112 P.3d 59 (Colo.2005). Based on Appendix A, we agree with defendants that heightened scrutiny is not required because the trial court did not merely adopt their draft wholesale.

4. In an earlier section of the decision, the court made a parallel change by deleting "I have separately concluded that none of the Peaberry Defendants was under a duty to disclose [the parent company's] financial information, and this information was not material."

5. CJI–Civ. 19:1 covers "False Representation—Elements of Liability," while 19:2 covers "Nondisclosure or Concealment—Elements of Liability." Plaintiffs argued both misrepresentation and concealment at trial. These two claims have similar elements, including reliance. CJI–Civ. 19:1, 19:2; *Nielson v. Scott*, 53 P.3d 777, 780 (Colo.App.2002) ("Common to both fraudulent concealment and fraudulent misrepresentation is the element of reliance....").

sion would have been unnecessary if, as defendants assert, the court had first found no duty to disclose.

The relevant portion of rewritten subsection H(1)(b), which we excerpt at length to show that the court rejected fraudulent nondisclosure based on lack of reliance rather than on no duty to disclose, reads:

> Fraudulent omission consists of the knowing concealment of a material fact that in equity and good conscience should be disclosed. All of these elements must be satisfied. *Plaintiffs' repeated acknowledgements and statements of non-reliance cannot be ignored.*
>
> The Court concludes that Peaberry actively concealed material financial facts from the Plaintiffs. The Court also concludes that the UFOC cannot be used to shield Peaberry from liability for its fraudulent omissions and concealment. . . .
>
> The Court concludes the concealed facts in this case were material, and Plaintiffs had no knowledge of the true facts about Peaberry's financial history and the performance of its stores. The concealed facts were also withheld with the intent that the Plaintiffs purchase their franchises ignorant of the true facts.
>
> *However, Peaberry's UFOC was explicit that it did not disclose any information regarding the profitability of PCI or its corporate-owned stores, and the Plaintiffs uniformly acknowledged that they understood Peaberry did not provide this information.* Further, the UFOC expressly advised Plaintiffs that they should not rely on information outside the UFOC and Franchise Agreement. Several Plaintiffs testified that they asked Peaberry for additional financial information regarding PCI and its stores and were told that it would not be disclosed. Finally, it is undisputed that each Plaintiff executed a Closing Acknowledgement statement and Franchise Agreement that contained numerous declaimers, statements of non-reliance, and integration provisions, *all of which communicated to the Peaberry Defendants that none of the Plaintiffs were relying on information outside the UFOC and Franchise Agreement,* or that any

such information, communicated in any form, would be binding. *See* Tr. Ex. 68.0142–43; 68.0080; 68.0082.

> *Again "[I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying."*

(Emphasis added.)

Therefore, because the court may have intended to find facts giving rise to a duty, we turn to reasonable reliance.

### B. Reasonable Reliance

■ Fraudulent nondisclosure requires proof of reasonable reliance on "the assumption that the concealed fact does not exist," *Nielson v. Scott,* 53 P.3d 777, 780 (Colo.App. 2002), or "was different from what it actually was." *See Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 525 (Colo.App. 2006) (Carparelli, J., specially concurring); CJI–Civ. 19:2. *See also Ackmann v. Merchants Mortgage & Trust Corp.,* 645 P.2d 7, 13–15 & n. 3 (Colo.1982) (citing with approval CJI–Civ. 19:2 for the elements of nondisclosure, and noting "[t]he statement of the elements of fraud by concealment in the Colorado Jury Instructions is substantially similar to the articulation of those elements contained in our case law"); *Dury v. Ireland, Stapleton, Pryor & Pascoe, P.C.,* *4, 2009 WL 2139856 (D.Colo. No. 08–cv–01285–LTB–MEH, July 14, 2009) (same).

■ "Whether a person seeking rescission of a contract has a right to rely on the misrepresentation is a question of fact and is binding on appeal if supported by the evidence." *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1382 (Colo.1994); *see also City of Black Hawk v. Ficke,* 215 P.3d 1129, 1132 (Colo.App.2008) (reasonable reliance giving rise to equitable estoppel is a question of fact for the trial court).

■ However, "[t]he determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine." *Jones v. Dressel,* 623 P.2d 370, 376 (Colo.1981); *see also Copper Mountain, Inc. v. Industrial Systems, Inc.,* 208 P.3d 692, 697 (Colo.2009) (appellate court not

bound by trial court's contract interpretation).

Here, plaintiffs proceeded on two distinct nondisclosure theories: failure to disclose net losses of the company stores and failure to disclose significant and consistent losses of the parent company. The trial court held that plaintiffs had failed to prove reasonable reliance under either theory. As to the former, it made factual findings and relied on Exhibit J; as to the latter, it relied only on other documentary evidence. For these reasons, we address the theories separately and employ different standards of review.

1. Reliance on Nondisclosure of Net
Losses at the Company Stores
Was Unreasonable

■ We conclude that the record and Exhibit J support the trial court's holding that any reliance by plaintiffs on defendants' nondisclosure of net losses at the company stores was unreasonable.

The court found, "Peaberry's UFOC made clear that Peaberry was only disclosing the gross sales information for PCI's corporate-owned stores," and two plaintiffs had used this information along with "publicly available store expense information" accurately to calculate the "break even revenue point" of the company stores. The court also found that these two plaintiffs had "developed pro forma analyses to determine profitability at different levels of revenue to determine the revenues they needed to achieve in order to obtain certain returns on their investments." Plaintiffs do not dispute these findings, which have some support in the record.

Based on these findings, the court concluded that where "the information to perform this analysis was publically available and any Plaintiff could have obtained this information," justifiable reliance cannot be proven because "reasonable due diligence would reveal accurate information." This conclusion is supported by cases such as *Cherrington v. Woods*, 132 Colo. 500, 506, 290 P.2d 226, 228 (1955) (fraud and misrepresentation claims unfounded "[w]here the means of knowledge are at hand and equally available to both parties") (internal quotations omitted).

The trial court went on to point out "Peaberry's UFOC made clear that Peaberry was only disclosing the gross sales information" for the company stores and that plaintiffs knew other information "was not being provided to them in the UFOC." In our view, the following language in Exhibit J of the UFOC adequately warned plaintiffs against inferring how their franchises would do based on gross sales of the company stores:

CAUTION: THE FOLLOWING DATA SHOULD NOT BE CONSIDERED AS THE ACTUAL OR POTENTIAL INCOME OR RESULTS OF OPERATIONS OF ANY PARTICULAR FRANCHISE. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ATTAIN THESE GROSS SALES LEVELS. A FRANCHISEE'S FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES REPRESENTED.

\* \* \*

YOU ARE URGED TO CONSULT WITH YOUR FINANCIAL, BUSINESS AND LEGAL ADVISERS TO CONDUCT YOUR OWN ANALYSIS OF THE INFORMATION CONTAINED IN THIS EXHIBIT.

\* \* \*

THE EARNING FIGURES DO NOT REFLECT THE COSTS OF SALES OR OPERATING EXPENSES THAT MUST BE DEDUCTED FROM THE GROSS REVENUE OR GROSS SALES FIGURES TO OBTAIN YOUR NET INCOME OR PROFIT. . . .

\* \* \*

EXCEPT FOR THE INFORMATION IN THIS ITEM, NO REPRESENTATIONS OR STATEMENTS OF ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL SALES, COSTS, INCOME OR PROFITS ARE MADE TO FRANCHISEES BY US.

Indeed, Exhibit J explained why plaintiffs should not draw any inference that company store performance was predictive of franchise performance.

Nevertheless, plaintiffs urge us to hold that where intentional fraud by nondisclosure has been alleged, public policy precludes considering exculpatory clauses in the calculus of reasonable reliance. *See Rhino Fund*, 215 P.3d at 1191 ("Most courts will not enforce exculpatory and limiting provisions ... if they purport to relieve parties from their own willful, wanton, reckless, or intentional conduct.").

*Rhino Fund* did not involve language of the specificity in Exhibit J.[6] Moreover, in *Keller v. A.O. Smith Harvestore Products, Inc.*, 819 P.2d 69, 73–74 (Colo.1991), the court held that "a general integration clause does not effect a waiver of a claim of negligent misrepresentation not specifically prohibited by the terms of the agreement," but left open the possibility that a clause "couched in clear and specific language" could protect a party from such a claim.

Informed by *Keller*, we are persuaded to give effect to the specific language in Exhibit J by cases such as *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057 (Del.Ch.2006) ("[i]f there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact"). *See also Hardee's of Maumelle, Arkansas, Inc. v. Hardee's Food Systems, Inc.*, 31 F.3d 573, 576 (7th Cir.1994) ("[I]t is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying."); *Konold v. Baskin Robbins, Inc.*, 87 F.3d 1327, 1996 WL 346607 (10th Cir.1996) (unpublished table decision) (following *Hardee's*).

Accordingly, we conclude that the trial court did not err in holding plaintiffs' claimed reliance on nondisclosure of net losses at some company stores to have been unreason-

able. However, the court pointed out, using language from the Peaberry defendants' draft of the decision, "The public availability of the store profitability information does not address the question of whether Plaintiffs had a right to rely on alleged misrepresentations regarding PCI's financial condition." Therefore, we turn to nondisclosure of the parent company's losses, which is not addressed in Exhibit J.

**2. The Exculpatory Clauses Do Not Preclude Reasonable Reliance on Nondisclosure of the Parent Company's Losses**

■ We reject the trial court's holding that the exculpatory clauses precluded plaintiffs from reasonably relying on nondisclosure of losses by the parent company. The only relevant clauses address nonreliance on affirmative representations outside of the transactional documents, not failure to disclose material information. Further, no clause either refers to information about the parent company's financial condition or negates reasonable inferences that could be drawn from assumptions about this information, as does Exhibit J with respect to performance of the company stores.

The decision does not identify the specific clauses on which the trial court based its conclusion. Likewise, defendants do not address any specific clauses in their briefs. Instead, they argue that the court's conclusions about the clauses were evidentiary findings entitled to deference unless lacking any record support.

■ As discussed above concerning subsection H(1)(b), we read the trial court's conclusion that plaintiffs failed to prove reasonable reliance concerning nondisclosure of the parent company's losses as based solely on the exculpatory clauses.[7] Thus, although

---

6. Although the FTC has explained that exculpatory clauses are unlikely to protect franchisors, it has not addressed the specificity issue presented here:

> Further, courts have limited the circumstances where integration clauses have the most potential for harm. Where there is fraud in the inducement, courts are likely to void the contract, regardless of any integration clause or waiver. Finally, integration clauses or waivers are not likely to protect franchisors from pri-

vate suits based upon fraudulent statements made in a disclosure document, even without Commission intervention.

72 Fed.Reg. 15444, 15534–35 (Mar. 30, 2007) (footnote omitted).

7. The only other subsection of the decision addressing reliance under the nondisclosure claim is F(1)(b), which preserved the original language submitted by the Peaberry defendants, ends with, "Stated simply, Plaintiffs expressly disclaimed reliance on all of the information that could have

typically reliance is a decision for the finder of fact, defendants cite no authority, nor have we found any in Colorado, holding that such a decision based on documentary evidence is entitled to deferential review. To the contrary, "An appellate court may draw its own conclusions from operative documentary material in the record." *Colorado Dep't of Personnel v. Alexander*, 970 P.2d 459, 467 (Colo. 1998). We do so as follows.

Plaintiffs have submitted as Appendix B to the opening brief, which defendants have not supplemented, a list of all exculpatory clauses in the closing acknowledgment and the franchise agreement, and some exculpatory clauses in Exhibit J. The list is attached as an appendix to this opinion.

We consider the following three clauses[8] most relevant to our discussion of parent company losses:

- Exculpatory Clause 1:

 I am not relying on any promises of PCFI which are not contained in the PCFI franchise agreement.

(Provision in closing acknowledgement.)

- Exculpatory Clause 2:

 This Agreement ... contains the entire agreement between the parties and supersedes any and all prior agreements concerning the subject matter hereof. The Franchisee agrees and understands that the Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution hereof or for claims of negligent or fraudulent misrepresentation.... The Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. The Franchisee further acknowledges and agrees that no representations have been made to it by the Franchisor regarding projected sales volumes, market potential, revenues, profits of the Franchisee's PEABERRY COFFEE Store....

(Provision in franchise agreement.)

- Exculpatory Clause 3:

 arguably led to a mistaken assumption about the financial performance of PCI...."

NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY OFFERING CIRCULAR SUPPLIED TO THE FRANCHISEE IS BINDING ON THE FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

(Provision in franchise agreement).

The other clauses in Appendix B are irrelevant to this inquiry because they pertain to franchisees taking responsibility for the success of their stores, understanding that opening any business is risky, and not relying on representations extrinsic to the transactional documents about the potential profitability of franchises.

The trial court rejected plaintiffs' theory that they reasonably relied on defendants' nondisclosure of the parent company's losses because:

All Plaintiffs were told that this information was not being disclosed.... Plaintiffs expressly disclaimed reliance on all of the information that could have arguably led to a mistaken assumption about the financial performance of [the parent company]....

The court's first statement ignores the second prong of the reasonable reliance test. *Premier Farm Credit*, 155 P.3d at 525 (assumption that the concealed fact "was different from what it actually was"). Here, plaintiffs all testified that they would not have bought franchises had they known of the parent company's longstanding losses. *Cf. Berger v. Security Pacific Info. Systems, Inc.*, 795 P.2d 1380, 1384 (Colo.App.1990) (fraudulent concealment properly submitted to jury where defendant made "statements indicating that SPIS was financially secure" which "would create a false impression without disclosure of the known, serious financial problems of SPIS"). The trial court made no finding concerning this testimony. And unlike the specific warnings about company store performance in Exhibit J, the court

---

8. These are identified as Disclaimers 10, 11, and 12 in the Appendix of Disclaimers.

made no finding that plaintiffs had been discouraged from relying on inferences concerning parent company financial information, only that they had been told it would not be provided.

The court's second statement as to plaintiffs' having "expressly disclaimed reliance" is not supported by the particular language of the three exculpatory clauses quoted above. Exculpatory Clause 1 does not shield defendants because it is limited to "promises of PCFI." Plaintiffs do not assert that PCFI made promises about the financial performance of the parent company. Similarly, Exculpatory Clause 2 disclaims reliance on "any representation of any nature other than those expressed in this Agreement." While broader than Clause 1, plaintiffs' nondisclosure claim does not rely on any such representation.

More importantly, neither clause disclaims reliance on undisclosed but material information.[9] *See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP,* 612 F.Supp.2d 267, 288 (S.D.N.Y.2009) (disclaimers inapplicable to nondisclosure of information going to "the heart of that agreement"). Thus, the trial court's paraphrasing of these clauses as "[plaintiffs] acknowledged they were not relying on any other information at the time they entered into their Franchise Agreements" is overbroad.

Exculpatory Clause 3 presents a closer question because it purports to preclude reliance on any other "act, event, or communication," and the parent company's losses could be such an event. However, the language of an exculpatory clause must be "closely scrutinized." *Jones,* 623 P.2d at 376.

To discern the meaning of "event," we look to the surrounding words. *Benuishis v. Industrial Claim Appeals Office,* 195 P.3d 1142, 1146 (Colo.App.2008) (applying doctrine of *noscitur a sociis,* meaning that an unclear phrase should be determined from the words immediately surrounding it). The word "event" is preceded by the words "statement" and "representation." It is followed by the word "communication." Therefore, we interpret "event" as limited to affirmative conduct directed at prospective franchisees, not to all information beyond that contained in the transactional documents that PCFI had a duty to disclose.

This interpretation is consistent with the "[not] binding on franchisor" language of Exculpatory Clause 3 because PCFI could choose not to be bound by affirmative but unauthorized conduct directed at prospective franchisees. In contrast, the parent company's losses raise a question of undisclosed facts that may be material to prospective franchisees and should be disclosed, not of whether those facts are binding on PCFI. Therefore, we decline to interpret Clause 3 as being sufficiently specific to preclude reliance on undisclosed parent company financial information that the trial court found to have been material.

Accordingly, we conclude that the general language of the exculpatory clauses does not preclude plaintiffs' reasonable reliance arising from nondisclosure of parent company losses.[10] Such losses are unlike financial per-

---

9. Cases disclaiming reliance on prior oral representations cited by defendants and the trial court are inapposite. *See, e.g., Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1058 (Del.Ch.2006) ("[t]o fail to enforce non-reliance clauses" "is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made").

10. In resolving the issue on this basis, we leave for another day whether to join those jurisdictions that have held public policy precludes such broadly drawn exculpatory clauses from protecting a fraud feasor. *See, e.g., Thomas H. Lee Equity Fund V, L.P.,* 612 F.Supp.2d at 288 ("An agreement induced on knowingly false pretenses, constitutes fraud and, despite the so-called merg-

er clause, [plaintiffs] are free to prove that [they were] induced by false and fraudulent misrepresentations to ... execute [the Agreement].") (internal quotations omitted); *Mankap Enterprises, Inc. v. Wells Fargo Alarm Services,* 427 So.2d 332, 333–34 (Fla.Dist.Ct.App.1983) ("The law is settled that a party cannot contract against liability for his own fraud in order to exempt him from liability for an intentional tort, and any such exculpatory clauses are void as against public policy."); *Slack v. James,* 364 S.C. 609, 614 S.E.2d 636, 641 (2005) ("A party should not be given the opportunity to free himself from an allegation of fraud by incorporating a generalized non-reliance clause into a contract."); *Helenius v. Chelius,* 131 Wash.App. 421, 120 P.3d 954, 965 (2005) ("a non-reliance clause does not

formance of the company stores, which Exhibit J explains is not predictive of franchise results at a different location and under different management. Rather, ongoing parent company losses could foreshadow its insolvency, which could destroy the value of a franchise regardless of its location or management.

### C. FTC Regulations Do Not Protect PCFI from Nondisclosure of the Parent Company's Losses

■ We review administrative regulations de novo and our primary task is to give effect to the enacting body's intent. *Obert v. Colorado Dep't of Social Services*, 766 P.2d 1186, 1190 (Colo.1988) (interpreting federal agency regulations).

The FTC regulates franchisors under the Franchise Rule (rule), 16 C.F.R. §§ 436.1 to 436.11 (2007), which seeks to prevent deceptive and unfair practices in the sale of franchises by requiring specific pre-sale disclosures to prospective franchisees. *See* 72 Fed.Reg. at 15445 (Statement of Basis and Purpose to Amended Rule).[11] These required disclosures are compiled into a disclosure statement, known in the industry as a UFOC. 16 C.F.R. § 436.1 (2003); 72 Fed. Reg. at 15448.

The rule requires disclosure of some financial statements of franchisors. 16 C.F.R. § 436.1 (2003). It permits disclosure of a parent company's financial statements only if the parent company serves as a guarantor of the franchising subsidiary:

> *Provided, however,* That where a franchisor is a subsidiary of another corporation which is permitted under generally accepted accounting principles to prepare financial statements on a consolidated or combined statements basis, the above information may be submitted for the parent if (A) the corresponding unaudited financial statements of the franchisor are also provided, and (B) the parent abso-

lutely and irrevocably has agreed to all obligations of the subsidiary.

16 C.F.R. § 436.1(a)(20)(i) (2003) (italics in original).

The rule also precludes franchisors from including information in the UFOC "other than required by this part or by State law not preempted by this part," but goes on to say, "[t]his does not preclude franchisors . . . from giving other nondeceptive information orally, visually, or in separate literature so long as such information is not contradictory to the information in the disclosure statement." 16 C.F.R. § 436.1(a)(21) (2003).

No appellate court has interpreted subsections 436.1(a)(20) or (21). The FTC addressed these sections in its commentary to the amended rule:

> We note that nothing in the Rule prohibits a franchisor from furnishing prospective franchisees with non-deceptive and non-contradictory information outside of its disclosure document. . . .
>
> Of course, franchisors are always free to disseminate additional truthful information to a prospective franchisee.

72 Fed.Reg. at 15516 n. 733, 15531 n. 886.

■ Defendants argue that because the parent company was not a guarantor of PCFI (which plaintiffs do not dispute), disclosing financial information about the parent was prohibited. But section 436.1(a)(20)(i)(A) deals only with "financial statements." Thus, its plain language would not preclude a general comment especially if provided "in separate literature," such as, "The franchisor is the wholly owned subsidiary of _____, which has not shown a profit during its __ years of operation."

Nevertheless, because the rule did not require PCFI to include in the UFOC any parent company financial information, we also address whether subsection 436.1(a)(21) preempts common law that plaintiffs allege requires disclosure of the financial informa-

as a matter of law necessarily preclude reasonable reliance").

**11.** The Franchise Rule was first adopted in 1978 and most recently amended in 2007. 72 Fed. Reg. at 15444–45. Although the events at issue here preceded the 2007 amendments, we reference the disclosure policy explained in the amended rule because the earlier versions are equally consistent with this policy. *See id.* at 15444.

tion at issue. We conclude that it does not, based on the reasons for and limitations of the disclosure requirements.

As indicated, the rule seeks to protect franchisees from unfair or deceptive practices. Disclosures do not "create a safe harbor for franchisors engaging in otherwise unlawful conduct." 72 Fed.Reg. at 15536. Further, the limitation on disclosing parent company financial statements to circumstances where the parent is a guarantor of its subsidiary franchisor prevents prospective franchisees from assuming that a parent may be a deep pocket available in the event of a dispute with the subsidiary franchisor. *Id.* at 15447. But merely disclosing a parent company's financial difficulties would not mislead a potential franchisee in this way. Nor would such a limited disclosure be "contrary to the information in the disclosure statement."

The FTC addressed preemption in a footnote to the pre–2007 rule, explaining:

> The FTC does not intend to preempt the franchise practices laws of any state or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with this Rule if it affords prospective franchisees equal or greater protection, such as registration of disclosure documents or more extensive disclosures.

16 C.F.R. § 436, note 2.[12] Because of the reference to "franchise practices laws," there may be no preemption of common law claims.

In any event, the reference to "inconsistency" limits our inquiry to direct conflict, not express or field preemption.[13] For reasons previously discussed, we discern no inconsistency between the prohibition against disclosing a parent's financial statements absent a guarantee and merely informing prospective franchisees that the franchisor's parent has been—or is—unprofitable.

Accordingly, we conclude that allegedly fraudulent nondisclosure of the parent company's losses is not protected by the FTC regulations.

### D. Remand is Necessary

Inconsistencies in the decision require remand for further findings rather than reinstating plaintiffs' fraudulent nondisclosure claims. *See People v. Zamora,* 695 P.2d 292, 299 (Colo.1985); *Boice v. Industrial Claim Appeals Office,* 800 P.2d 1339, 1342 (Colo. App.1990). Because the judge to whom the case was tried is in the best position to make such findings, remand proceedings shall occur before Judge William D. Robbins. For guidance in what further findings are necessary, we detail the inconsistencies that bear on duty to disclose, intent, and reliance.

Sections F, G, and H of the decision deal with aspects of the fraudulent nondisclosure claim. Section H is divided into the following subsections:

1. No Duty of Disclosure
 a. Customary Disclosure in the Trade
 b. False Impression of the Facts
 c. PCI's Corporate Restructuring

We have observed that the trial court would not have analyzed "False Impression of the Facts" in detail unless it had first found a duty to disclose. However, the court left in subsection H(1)(c), "Based on the foregoing findings and conclusions, I ultimately conclude that none of the Peaberry Defendants were under a duty to disclose the information Plaintiffs allege was omitted or concealed." Hence, on remand the trial court should make additional findings on duty to disclose, if any. In the event the court does not find facts giving rise to a duty,

---

12. The FTC has since elevated this preemption language into the text of the amended rule. 16 C.F.R. § 436.10(b) (2007); *see also* 72 Fed.Reg. at 15537.

13. The commentary further addresses the question of preemption:

> Congress did not intend the Act to occupy the field of consumer protection regulation. Any preemptive effect of the Franchise Rule, there-fore, is limited to instances where it is impossible for a private party to comply with both state and the Commission regulations, or where application of state regulations would frustrate the purposes of the Franchise Rule. .... Accordingly, the amended Franchise Rule would not affect state laws providing greater consumer protection.

72 Fed.Reg. at 15537.

further findings concerning fraudulent nondisclosure are not required.

If the court finds facts giving rise to a duty to disclose, it should address the following inconsistencies related to intent:

- In subsection H(1)(b), the court added:

 The Court concludes that Peaberry actively concealed material financial facts from the Plaintiffs.... The concealed facts were also withheld with the intent that the Plaintiffs purchase their franchises ignorant of the true facts.

- But in section G, the court adopted the language drafted by the Peaberry defendants:

 I cannot conclude on the evidence before me that Mr. Tointon, Mr. Orr, PCI, or PCFI acted with the requisite intent or recklessness to support Plaintiffs' intentional fraud claims.

If the court also finds fraudulent intent, it should address the following inconsistencies related to reliance:

- Within subsection H(1)(b), the trial court dealt exclusively with the nonreliance clauses in finding that plaintiffs failed to prove reasonable reliance.

- The court made no finding that plaintiffs had relied on assumed profitability of the parent company.

- In subsection F(1)(a), the court did not change:

 All of the Plaintiffs testified that their interest in buying a Peaberry franchise was largely driven by their very positive experience with Peaberry coffee stores as customers, and that they read and understood the franchise agreements.

- Although plaintiffs refer to testimony that they would not have bought franchises knowing of the parent company's losses, the court did not make any findings whether plaintiffs would have purchased the franchises had they known of these losses.

- The court found that plaintiffs had been told parent company financial information would not be provided.

If on remand the trial court again rejects the fraudulent nondisclosure claim, the judgment in favor of defendants shall be reinstated and further proceedings are limited to PCFI's attorney fees. If the court upholds this claim, then:

- Judgment shall enter in favor of plaintiffs and against PCFI for the rescission damages found by the court;

- The court shall make further findings concerning the personal liability, if any, of Tointon and Orr, as discussed in subsection V(A) below, and enter judgment accordingly;

- The judgment on the counterclaims and for attorney fees shall not be reinstated; and

- The fraudulent nondisclosure and aiding and abetting claims against Perkins Coie shall proceed.

### III. The CCPA Claim Was Properly Dismissed

■ Plaintiffs next contend the trial court erred in its C.R.C.P. 41(b) dismissal of their claim under the CCPA on the basis that, "Plaintiffs have failed to meet their burden of proof with regard to the public interest requirement of the CCPA." We agree with the trial court.

Plaintiffs do not challenge the following findings in the dismissal order:

- Franchise information was posted on the Peaberry website;

- The posting produced 500 to 635 inquiries;

- PCFI screened these inquiries based on financial ability and interest in a territory open for development; and

- It responded to the remaining inquiries by sending an information packet that included a UFOC and the *Denver Business Journal* article.[14]

The trial court did not find the number of information packets sent. Plaintiffs' opening brief states that "approximately 68 packets" were sent, which the Peaberry defendants do not dispute.

---

14. For purposes of the dismissal order, the trial court apparently assumed, as it later concluded in the decision, that the statement in the article, "Peaberry is profitable now," was false.

When ruling under C.R.C.P. 41(b), "the court must determine whether judgment in favor of defendant is justified on the evidence presented." *DSCO, Inc. v. Warren,* 829 P.2d 438, 441 (Colo.App.1991). If reasonable minds could differ over the inferences and conclusions to be drawn from the evidence at the conclusion of a plaintiff's case, then an appellate court cannot disturb the findings and conclusions of the trial court. *R.A. Reither Constr., Inc. v. Wheatland Rural Elec. Ass'n,* 680 P.2d 1342, 1345 (Colo.App.1984).

Plaintiffs assert that we should review the public impact requirement de novo, citing *Coors v. Security Life of Denver Insurance Co.,* 91 P.3d 393, 399 (Colo.App.2003), *aff'd in part and rev'd in part,* 112 P.3d 59 (Colo. 2005). We do not read *Coors* as requiring such review in all cases. However, here we will review that requirement de novo because the facts set forth in the C.R.C.P. 41(b) order are undisputed. *Curragh Queensland Mining Ltd. v. Dresser Industries, Inc.,* 55 P.3d 235, 241 (Colo.App.2002) (where facts undisputed, "as a matter of law" transaction would not significantly affect public); *see also Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 150 (Colo. 2003) ("[O]ur review of the record leads us to conclude that there was no significant public impact in this case.").

To obtain relief under the CCPA, a claimant must prove, inter alia, that an unfair or deceptive trade practice "significantly impact[s] the public as actual or potential consumers." *Hall v. Walter,* 969 P.2d 224, 234 (Colo.1998). Three factors must be considered in determining public impact:

> (1) The number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Rhino Linings,* 62 P.3d at 149.

On appeal, plaintiffs do not assert that sending the 68 packets alone constituted public impact. Instead, they argue that "widespread advertising [on the Internet], followed by direct solicitation, significantly impacted the public as actual or potential purchasers of a Peaberry franchise." We are not persuaded, for the following three reasons.

First, many Colorado CCPA cases refer to "the number of consumers *directly* affected." *See, e.g., id.* (emphasis added). We discern no such direct effect on either persons who merely read the Internet posting or those who responded to it, but were screened out by PCFI.

Second, the *Rhino Linings* court explained:

> Our review of Rhino's public advertisements reveals nothing disingenuous about the nature or exclusivity of dealership territories. Rather, they indicate only that dealerships are available in selected areas. We contrast Rhino's advertisements, *which contain no deception,* with the defendant-developer's advertisements in *Hall,* where we concluded that the defendants' widespread advertisements had a significant public impact *because the public was told important facts by the defendant which were untrue.*

*Id.* at 150 (emphasis added). Plaintiffs do not point to—nor do we discern—anything affirmatively "untrue" about the Internet posting, which provided only general information.

Third, no public impact was found in *Curragh Queensland Mining,* 55 P.3d at 241, where the defendant's advertising went to "about 3,000 mining companies," but as with PCFI's screening process, "only a few" could afford the equipment advertised.

Plaintiffs further argue that "advertising designed to lure members of the public into a fraudulent concealment scheme demonstrates the potential that consumers could be impacted in the same manner as plaintiffs were." They point out that in *Hall* only two persons were adversely affected by the misrepresentation that the lots being sold had access rights over adjoining land. Plaintiffs' reliance on *Hall* is misplaced because there the defendants "widely advertised these lots

and *offered them for sale to the general public.*" 969 P.2d at 227–28 (emphasis added).

■ But here, the first page of Peaberry's Internet posting contained a bold-face disclaimer: "FOR GENERAL INFORMATION ONLY AND ... NOT INTENDED TO BE THE OFFER OF A FRANCHISE." Similar wording appeared on the franchisee application included in the posting.[15] This language also distinguishes out-of-state cases cited by plaintiffs finding sufficient public impact in widespread advertising that offers a product for sale but creates a false impression by nondisclosure of material information.[16]

To hold that every such informational posting satisfies the public impact requirement, if it fails to include all "material information concerning goods, services, or property," § 6–1–105(1)(u), C.R.S.2009, would significantly expand the CCPA. For example, a notice of public auction would have to disclose all latent defects in the goods being offered that are known to the seller, even if the notice did not describe any particular goods and only a few consumers purchased goods in ignorance of those defects. Such expansion would contravene the public/private distinction articulated in many CCPA cases. *See, e.g., Brodeur v. American Home Assurance Co.*, 169 P.3d 139, 155 (Colo.2007) ("[T]he [CCPA] is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.") (internal citation omitted).

Turning to the second factor, plaintiffs did not attempt to prove the relative sophistication and bargaining power of the persons who read the Internet posting. Even assuming that such a profile could be inferred from information about either the 500 to 635 persons who responded or the 68 persons to whom information packets were sent, plaintiffs offered no evidence of the demographics of either group.

As to the third factor, plaintiffs likewise presented no evidence that the franchise program had either predated the Internet posting or continued after the 68 packets were sent. In its decision the trial court found that by late 2004, PCFI had decided "to put franchise sales on hold," pending "resolution of the problems that the first franchisees faced."

Accordingly, we conclude that plaintiffs' CCPA claim was properly dismissed because they failed to prove public impact.[17]

### IV. The Jury Waiver Was Properly Enforced

■ Plaintiffs next contend that because the trial court erred in striking their jury demand based on a waiver in the franchise agreement, all of their claims should have been tried to a jury. Alternatively, they contend they were entitled to a jury trial on their claims against Perkins Coie because it was not a party to that agreement. We conclude that in the franchise agreement plaintiffs waived their right to a jury trial, and that as an agent of a party to the agreement, Perkins Coie properly demanded that the claims against it be tried to the court.

The franchise agreement that all plaintiffs either signed or succeeded to provides in pertinent part:

23.2. Governing Law/Consent to Venue and Jurisdiction.

[I]f a claim is asserted in any legal proceeding involving the Franchisee, its officers, directors, managers, or partners (collectively, "Franchisee Affiliates"),

---

15. The general rule is that advertisements do not constitute enforceable offers for sale unless "the advertisement is 'clear, definite, and explicit, and leaves nothing open for negotiation.'" *Watson v. Public Service Co.*, 207 P.3d 860, 869 (Colo. App.2008).

16. In *Bloor v. Fritz*, 143 Wash.App. 718, 180 P.3d 805, 816 (2008), "Miller [the agent] does not dispute that he advertised the property for sale to the public by listing it in the multiple listing service directory and placing a for sale sign on

the property." Similarly, *Svendsen v. Stock*, 143 Wash.2d 546, 23 P.3d 455, 458 (2001), involved a multiple listing. And *Campbell v. Beak*, 256 Ga. App. 493, 568 S.E.2d 801, 805 (2002), dealt with a newspaper ad to sell a car.

17. We decline to address defendants' argument that the dismissal could also be upheld because certain findings in the decision show they did not engage in a deceptive trade practice under section 6–1–105(1)(u) and plaintiffs failed to prove causation.

and the Franchisor, its officers, its officers, directors, or sales employees (collectively, "Franchisor Affiliates") the parties agree that the exclusive venue for disputes between them shall be in the state and federal courts of Colorado and each party waives any objection that they may have to the personal jurisdiction of or venue in the state and federal courts of Colorado. *The Franchisor, the Franchisor Affiliates, The Franchisee and the Franchisee Affiliates each waive their rights to a jury trial.*

(Emphasis added.)

The original judge "determin[ed] that the franchise agreement contains an unambiguous mutual waiver of both parties' right to a trial by jury," without further analysis. Later, the court granted Perkins Coie's motion to strike plaintiffs' jury demand, reasoning that as an agent of PCFI, Perkins Coie was entitled to invoke the waiver in the franchise agreement. Plaintiffs do not challenge the agency finding.

 All parties agree that we review application of a jury waiver provision de novo. Our duty "is to interpret and enforce contracts as written between the parties." *Fox v. I–10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998). In doing so, we assume that "[w]ritten contracts which are complete, clear in their terms, and free from ambiguity ... express the intention of the parties." *Radiology Professional Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 256, 577 P.2d 748, 751 (1978).

 Plaintiffs do not assert ambiguity in the jury waiver provision, nor do we discern any. Instead, they argue that, "under federal case law ... a contractual jury waiver is enforceable only if knowingly, voluntarily and intentionally made, which requires consideration of a number of factors." *See, e.g., Dreiling v. Peugeot Motors of America, Inc.*, 539 F.Supp. 402, 403 (D.Colo.1982). They cite no Colorado case, nor have we found one, applying this test, which rests on the Seventh Amendment to the United States Constitu-

tion guarantee of the right to trial by jury. *See, e.g., Leasing Service Corp. v. Crane*, 804 F.2d 828, 833 (4th Cir.1986).[18] We decline to adopt the federal jury waiver test because in Colorado, "there is no constitutional right to a trial by jury in a civil action.... [T]he right to a jury trial in a civil case is derived from C.R.C.P. 38." *Kaitz v. Dist. Court*, 650 P.2d 553, 554–55 (Colo.1982) (internal citations omitted); *accord Snow Basin, Ltd. v. Boettcher & Co.*, 805 P.2d 1151, 1154 (Colo. App.1990).

 Instead, we determine the enforceability of such a provision under general contract interpretation principles. *See Cook v. Hibernia Nat'l Bank*, 847 So.2d 617, 617 (La.Ct.App.2002). Here, plaintiffs have not asserted that the provision is unfair, unreasonable, or beyond their ability to understand. *See Vista Centre Venture v. Unlike Anything, Inc.*, 603 So.2d 576, 578 (Fla.Dist. Ct.App.1992); *cf. Adams Reload Co. v. Int'l Profit Associates, Inc.*, 143 P.3d 1056, 1060 (Colo.App.2005) (party challenging forum selection clause must show that it is unfair or unreasonable).

 Accordingly, we discern no error in the initial order upholding the jury waiver. Because the waiver does not mention Perkins Coie, nor is Perkins Coie within the waiver's definition of "Franchisor Affiliates," we turn to whether Perkins Coie can assert the waiver as an agent of PCFI. We agree with Perkins Coie that it can.

Perkins Coie relies on *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212 (3d Cir. 2007), as did the trial court. The *Tracinda* court adopted cases allowing nonsignatory agents to invoke arbitration clauses. It further explained that because the nonsignatory agent sought "to invoke the jury waiver provision in the agreement entered into by his corporate principal," and "corporations can 'act only through agents,'" such a waiver "'would be of little practical value' if it failed to protect nonsignatory agents." *Id.* at 225 (internal citations omitted).

**18.** Other states have applied this test based on the right to a civil jury trial in their own constitutions. *See* Jay M. Zitter, Annotation, *Contractual Jury Trial Waivers in State Civil Cases*, 42 A.L.R.5th 53 (1996).

A division of this court has recognized that "[c]ourts have bound nonsignatories to arbitration agreements under principles of agency." *Smith v. Multi–Financial Securities Corp.*, 171 P.3d 1267, 1272 (Colo.App.2007) (decided on the basis of estoppel). Further, we consider *Tracinda* well reasoned and follow it here.

Although plaintiffs urge that *Tracinda* should be limited to agents who are corporate officers or directors, we perceive no basis in its rationale for doing so. The court's concern that "it would be too easy to circumvent the agreements by naming individuals instead of the entity," *Tracinda*, 502 F.3d at 225 (internal quotations omitted), does not distinguish officers and directors from other agents. *See also Mowbray v. Zumot*, 536 F.Supp.2d 617, 623 (D.Md.2008); *In re Credit Suisse First Boston Mortgage Capital, L.L.C.*, 273 S.W.3d 843, 848 (Tex. App.2008).[19]

Therefore, we further conclude that where, as here, an agent is sued for conduct undertaken in furtherance of its principal's interests and the agent's position on jury waiver is consistent with that of the principal under a waiver in the contract between the principal and the claimant, the agent may invoke the waiver against the claimant.

## V. Further Proceedings

Our conclusion that the trial court erred in relying on the exculpatory clauses to hold that plaintiffs had not established reliance as to nondisclosure of the parent company's losses requires that we address the following issues.

### A. Personal Liability

■■■■ Corporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct. *Hoang v. Arbess*, 80 P.3d 863, 868 (Colo.App.2003).

Whether a corporate agent participated in fraudulent conduct is a question of fact. *Id.*

As relevant to the personal liability of Tointon and Orr, the trial court made the following findings:

- There was no evidence upon which I could conclude that Tointon's dealings with Perkins Coie regarding the information to be disclosed in the UFOC involves any fraudulent intent.
- With respect to the franchise sales process, the evidence is consistent that Mr. Tointon had turned operational control of Peaberry over to Fred Nielsen, and that Mr. Tointon did not supervise the activities of Jim Orr or Fred Nielsen with respect to the franchise sale process.
- [Tointon] did not direct the activities of the franchise marketing process.
- [Tointon] was not involved in any of the day to day operations of Peaberry following Mr. Nielsen's hiring.
- Mr. Orr's liability is limited to his own knowledge, statements, and actions.
- [The] "Peaberry is profitable now" [statement in the *Denver Business Journal* article] did not result from any actions taken by Mr. Orr.
- Mr. Orr testified that he had no knowledge of PCI's finances or of the profitability of its stores during the relevant time period.

Based on these findings, the court stated, "I cannot conclude on the evidence before me that Mr. Tointon, Mr. Orr, PCI, or PCFI acted with the requisite intent or recklessness to support Plaintiffs' intentional fraud claims." Although the evidence was disputed, we cannot say that these findings are clearly erroneous.

■■■■ However, as discussed more fully in subsection II(D) above, the trial court also found that "Peaberry actively concealed material financial facts from the Plaintiffs" and that these facts were "withheld with the in-

---

19. In *In re C–Span Entertainment, Inc.*, 162 S.W.3d 422, 428 (Tex.App.2005), the court rejected a law firm's agency argument for invoking a jury waiver because, "rather than liability based upon agency principles—an agent acting on behalf of his principal based on authority to do so— the relevant liability here is that of the agent *to* its principal for allegedly violating its duties as agent." Unlike that law firm, Perkins Coie's alleged misconduct was in furthering the objectives of PCFI.

tent that the Plaintiffs purchase their franchises ignorant of the true facts." These findings create a dilemma over who acted with such intent, because "a corporation can only act through it agents." *Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 47 (Colo. 1997).

The decision begins by defining the "Peaberry Defendants" to include the parent company, PCFI, Tointon, and Orr. However, in its total rewrite of subsection H(1)(b), the trial court used both "Peaberry" and "the Peaberry Defendants." The language that the court struck included:

- Neither Bill Tointon nor Jim Orr had a personal duty of disclosure . . . .
- Mr. Tointon was not personally aware of any facts that would have led to this additional duty of disclosure.
- [T]heir Third Claim for Relief against [Tointon] individually must fail.
- Mr. Orr was not involved in the decision whether to disclose [the parent company's] financial information . . . .
- Accordingly, [Orr] has no personal liability with respect to Plaintiffs' Third Claim for Relief.

As a result of these changes, we are unable to determine who the trial court concluded had acted with the intent to conceal. Therefore, if on remand the trial court finds that plaintiffs have established fraudulent nondisclosure, it should make further findings concerning the personal liability, if any, of Tointon and Orr, and may enter judgment against one or both of them consistent with those findings.

### B. Alter Ego

 Whether the corporate identity should be disregarded under the alter ego doctrine is a question of fact. *Cf. McCallum Family L.L.C. v. Winger,* 221 P.3d 69, 73 (Colo.App.2009) (corporate veil piercing is fact specific). Appellate courts review a trial court's legal conclusions in finding alter ego status de novo, and examine its related findings of fact for clear error. *United States v. Funds Held in Name or for Benefit of Wetterer,* 210 F.3d 96, 106 (2d Cir.2000).

██ Here, we discern no such clear error in the trial court's following findings, on the basis of which it rejected the claim that the parent company "was the alter ego of PCFI":

> [The parent company], PCFI, and Mr. Tointon observed corporate formalities at all times. Any transfers of funds between PCFI and [the parent company] were accounted for using Generally Accepted Accounting Principles, and PCFI's books were independently audited on an annual basis . . . .

Further, the court noted the absence of "evidence supporting a disregard of corporate formalities for the purpose of using the corporate form to perpetrate a fraud." This finding is consistent with its earlier finding, which plaintiffs do not challenge, that "Plaintiffs have failed to produce precise and indisputable evidence that PCFI was formed for a fraudulent purpose." The court also acknowledged expert testimony that subsidiaries such as PCFI are commonly created to market franchises.

We are not persuaded otherwise by plaintiffs' assertion that "PCFI was an assetless shell." The trial court made no such finding. Even if the record supports this assertion, plaintiffs do not point to any expert testimony concerning the appropriate level of capital for PCFI, given its limited activities. And inadequate capitalization is but one of ten factors relevant to disregarding a corporate entity, several of which the trial court addressed. *Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC,* 37 P.3d 485, 490 (Colo. App.2001).

### C. Counterclaims

The trial court entered judgment against seven of the plaintiffs for breach of their franchise agreements in varying amounts representing unpaid royalties. On appeal, plaintiffs do not dispute the court's observation that they failed to present any contrary evidence. Instead, they assert the invalidity of the franchise agreements based on fraud. PCFI responds only by noting that the trial court did not find fraud.

We agree with plaintiffs that if on remand the trial court makes further findings upholding their fraudulent nondisclosure claim, then

the counterclaims must fail because, as discussed in the following subsection, we agree with the trial court that plaintiffs elected to rescind. *See, e.g., Crawford Rehabilitation Services, Inc. v. Weissman,* 938 P.2d 540, 547 (Colo.1997) (fraud constitutes a defense to breach of contract). Otherwise, the judgment on the counterclaims shall be reinstated.

Likewise, if the franchise agreements are void for fraudulent nondisclosure, PCFI is not entitled to recover appellate attorney fees. If the trial court again rejects the fraudulent nondisclosure claim, it shall include reasonable attorney fees for the appeal in its award to PCFI. C.A.R. 39.5.

### D. Election of Remedies

■■■ "The question of intent to rescind is one of fact." *Burnford v. Blanning,* 189 Colo. 292, 295, 540 P.2d 337, 340 (1975); *accord Lansdale v. Geerlings,* 523 P.2d 133, 137 (Colo.App.1974) (not published pursuant to C.A.R. 35(f)). An election to rescind may be determined on the basis of conduct. *H & K Automotive Supply Co. v. Moore & Co.,* 657 P.2d 986, 988 (Colo.App.1982); *Bankers Trust Co. v. International Trust Co.,* 108 Colo. 15, 33, 113 P.2d 656, 664 (1941).

The trial court found that all plaintiffs had elected to rescind their franchise agreements. It relied on three plaintiffs' election in the pleadings, two plaintiffs' trial testimony that they did not intend to continue operations, and all plaintiffs having ceased paying royalties. Plaintiffs do not dispute these findings. We discern no basis for reversal.

Although plaintiffs cite authority that an election to rescind is revocable, they do not identify any of their conduct consistent with the continued viability of the franchise agreements as evincing their intent to affirm. *See Holscher v. Ferry,* 131 Colo. 190, 280 P.2d 655 (1955) (plaintiff's election of rescission may be demonstrated by actions during the pendency of litigation).[20]

### VI. Reinstatement of Claims Against Perkins Coie

Plaintiffs next contend the trial court improperly dismissed their claims against Perkins Coie for violation of the CCPA, fraudulent nondisclosure, aiding and abetting fraudulent nondisclosure, and negligent misrepresentation.

We perceive no basis on which the CCPA public impact issue could be decided differently as to Perkins Coie, nor do plaintiffs explain how it could be. The trial court relied on its dismissal of the fraudulent nondisclosure and negligent misrepresentation claims against the Peaberry defendants without making further findings as to Perkins Coie. Because we have vacated the judgment in favor of the Peaberry defendants on the claim for fraudulent nondisclosure of the parent company's losses, the judgment in favor of Perkins Coie on this claim and the related aiding and abetting claim must be vacated as well, subject to further findings. However, we conclude that the trial court made sufficient findings concerning the Peaberry defendants to affirm dismissal of the negligent misrepresentation claim against Perkins Coie.

### A. Fraudulent Nondisclosure

Plaintiffs assert that "[t]his court cannot act as a finder of fact regarding issues relating to Perkins Coie's participation in Peaberry's fraud" and "[t]he trial court never considered the merits of the claims asserted against Perkins Coie." But they fail to identify any factual basis on which the trial court could decide the fraudulent nondisclosure claim in favor of the Peaberry defendants, which may be the outcome on remand, but decide it or the related aiding and abetting claim against Perkins Coie. *See, e.g., Erskine v. Beim,* 197 P.3d 225, 232 (Colo.App.2008) (declining to address contention lacking reference to specific facts or supporting argument). However, Perkins Coie agrees that reversal of the judgment on the nondisclosure claim would require further proceedings

**20.** Plaintiffs further contest the trial court's determination that their evidence of lost future profits "is also legally insufficient to support any award." Having affirmed the rescission ruling, we need not address this issue.

against it as to fraudulent nondisclosure and aiding and abetting.

## B. Negligent Misrepresentation

Plaintiffs argue that the negligent misrepresentation claim "must be reinstated and remanded to the trial court" because "[n]umerous fact issues must be resolved." But because they did not appeal dismissal of the negligent misrepresentation claim against the Peaberry defendants, we must accept the trial court's findings related to the UFOC.

Further, they identify no such "fact issues" unique to Perkins Coie. Nor do they point to any direct interaction with Perkins Coie, other than having received the UFOC that Perkins Coie prepared. Their conclusory assertion that "Perkins Coie prepared a misleading and deceptive document"—the UFOC—by "falsely portray[ing] Peaberry Coffee as an established viable company with an established business model" does not persuade us to reinstate the negligent misrepresentation claim against Perkins Coie.

■ The trial court dismissed the negligent misrepresentation claim for the same reasons discussed in subsection II(B) above that it dismissed the fraudulent nondisclosure claim: exculpatory clauses in the transactional documents and publicly available information about company stores' profitability precluded reasonable reliance. But the trial court also found, with record support, that "no representations regarding store profitability are contained in Exhibit J, and that it is not otherwise misleading." We conclude that this finding dooms the negligent misrepresentation claim against Perkins Coie, for two reasons.

First, the evidence supports the trial court's findings concerning Exhibit J, which clearly provided only gross sales for the company stores and, as discussed in subsection II(B)(1) above, contained various warnings. Other than by disclosing only gross sales, plaintiffs do not explain how Exhibit J affirmatively misrepresented anything.

Second, although we have concluded that nondisclosure of the parent company's losses could support a fraud claim, our analysis here is limited to what Perkins Coie affirma-

tively represented, not what it failed to disclose. *See Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo.App.1989); *see also Sheffield Services Co. v. Trowbridge*, 211 P.3d 714, 725 (Colo.App.2009) (whether Colorado law even recognizes a claim of negligent nondisclosure is uncertain).

On appeal, plaintiffs argue that "[t]he UFOC falsely portrayed Peaberry Coffee as an established viable company with an established business model." But they do not point to any specific language in the UFOC that constitutes an affirmative misrepresentation, and we are unwilling to search its 139 pages. *Erskine*, 197 P.3d at 232. Further, plaintiffs cite no authority, nor have we found any in Colorado, that would support expanding negligent misrepresentation to include such a general portrayal.

Accordingly, we conclude that the trial court properly dismissed the negligent misrepresentation claim against Perkins Coie.

## C. Bifurcation

■ Plaintiffs next contend the trial court erred in bifurcating the trial of plaintiffs' claims against the Peaberry defendants from those against Perkins Coie. We disagree.

Initially, plaintiffs have not explained how, exactly, they were prejudiced by this order. In the interest of resolving the issue, we will assume without deciding that had all claims been tried together, plaintiffs may have benefitted from Perkins Coie defending itself based on otherwise privileged communications with the Peaberry defendants.

■ Under C.R.C.P. 42(b), bifurcation may be proper where separate trials will avoid substantial prejudice that cannot be mitigated by other measures. *Martin v. Minnard*, 862 P.2d 1014, 1016 (Colo.App. 1993). We shall not disturb a trial court's decision to bifurcate a trial absent an abuse of discretion. *Prudential Property & Casualty Insurance Co. v. Dist. Court*, 617 P.2d 556, 558 (Colo.1980).

The trial court's order is sufficiently detailed for us to uphold its decision under this standard:

In this case, prejudice lies with permitting Plaintiffs access to confidential materials used for the purpose of Perkins Coie's defense, while that same access would permit use of that material offensively by the Plaintiffs against Perkins Coie's former client, the Peaberry Coffee Defendants. There is no procedural safeguard to prevent Plaintiffs' attorneys from accessing evidence that the Peaberry Defendants are entitled to withhold, necessary to the defense of Perkins Coie and preventing the use of that information against the Peaberry Defendants. Therefore, separate trials are appropriate.

Thus, on the one hand, once the court rejected the crime-fraud exception to attorney-client privilege, which plaintiffs have not challenged, Peaberry had an absolute statutory right to assert the privilege. § 13–90–107(1)(b), C.R.S.2009. On the other hand, in a joint trial Perkins Coie could use privileged communications as necessary to defend itself. Colo. RPC 1.6(b)(6).

Accordingly, we conclude that the trial court did not abuse its discretion in bifurcating the claims against Perkins Coie to avoid prejudice. *Martin,* 862 at 1016.

The judgment is affirmed in part, vacated in part, and the case is remanded for further proceedings before Judge Robbins consistent with this opinion. The trial court's actions on remand are subject to appeal by any party.

Judge TERRY concurs.

Judge CONNELLY specially concurs.

Judge CONNELLY specially concurring.

I concur fully in the result and in almost all the reasoning of the comprehensive majority opinion. My only disagreement involves the Colorado Consumer Protection Act (CCPA) claim.

I would hold simply that the trial court did not clearly err in finding as a matter of fact that plaintiffs had not proven the public impact required under the CCPA. In my view, plaintiffs' proof fully sufficed as a matter of law to get this case to a trier of fact. But the proof of public impact was not so incontrovertible as to preclude a finding against plaintiffs. Accordingly, while I cannot agree that plaintiffs' proof was legally insufficient, neither would I overturn the trial court's rejection of that proof as a matter of fact.

The court found against plaintiffs after hearing their entire case; its C.R.C.P. 41(b)(1) dismissal order made clear it was acting as "trier of fact." The court articulated the correct legal standards and the relevant factors governing the public impact element. The only dispute is whether it erred in finding that plaintiffs "failed to meet their burden of proof" on that element. Absent clear error, we must accept the trial court's factual findings. C.R.C.P. 52; *Matoush v. Lovingood,* 177 P.3d 1262, 1269 (Colo.2008).

There apparently are "no Colorado cases determining when the question of 'significant public impact' is a question of law for the judge or when it is a question of fact for the jury." CJI–Civ. 4th 29:4 n. 1 (2009). But no one disputes that CCPA damages claims are generally jury-triable or that public impact is one CCPA element. A jury or trial court should have the case-specific responsibility of deciding whether a significant public impact has been established under the particular facts. Even assuming that finding ultimately determines the viability of a CCPA action, the clear error standard applies to many such ultimate determinations. *See, e.g., Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

In arguing for de novo appellate review, plaintiffs rely on a prior division's statement that "public impact was not proven as a matter of law," *Coors v. Security Life of Denver Ins. Co.,* 91 P.3d 393, 399 (Colo.App. 2003), *aff'd in part and rev'd in part on other grounds,* 112 P.3d 59 (Colo.2005). But that statement simply meant that a directed verdict should have been granted because no reasonable trier of fact could have found the element established on those particular facts. *See generally In re Rosen,* 198 P.3d 116, 119 (Colo.2008) (discussing directed verdict standard).

I recognize that even where an issue is one of fact, de novo appellate review may be

appropriate where "the controlling facts are undisputed." *Hicks v. Londre,* 125 P.3d 452, 455 (Colo.2005). It is on this basis that the majority in this case exercises de novo review.

I cannot agree, however, that the facts are undisputed here. Several factors bear on whether public impact has been proven, including "the number of consumers directly affected by the challenged practice"; "the relative sophistication and bargaining power of th[ose] consumers"; and the extent to which the challenged practice "has previously impacted other consumers or has the significant potential to do so in the future." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 149 (Colo.2003).

Plaintiffs adduced evidence that, if credited, showed that the challenged practices involved more than a purely private wrong. The evidence tending to show an actually or potentially significant public impact included public advertising, use of a misleading Denver magazine article, the relative lack of sophistication of at least some of the targeted franchisees, and the fact that at least 500 persons (of whom 68 received further information) responded to defendants' solicitations.

Plaintiffs' proof was much stronger than that described in prior appellate opinions holding public impact unproven as a matter of law. In *Rhino Linings,* there were only "[t]hree affected dealers out of approximately 550 worldwide." 62 P.3d at 150. In *Coors v. Security Life,* similar letters were sent to only some "200 out of 20,000 policyholders," and "there was no more evidence before the trial court regarding the other policyholders." 91 P.3d at 399. And in *Curragh Queensland Mining, Ltd. v. Dresser Industries, Inc.,* "only a very few [mining companies] could muster the financial resources necessary to purchase a $38 million" piece of equipment that defendant offered to sell. 55 P.3d 235, 241 (Colo.App.2002).

At the same time, there were facts cutting against a finding of significant public impact. The trial court relied on, and the majority opinion recounts, those facts.

I therefore cannot find that plaintiffs established significant public impact as a matter of law. Because I view public impact as a question of fact, and because I cannot say the trial court clearly erred in ruling against plaintiffs as a matter of fact, I concur in the judgment affirming the trial court's rejection of the CCPA claim.

### APPENDIX OF DISCLAIMERS

(Submitted as Appendix B to Plaintiffs' Opening Brief)

### I. Disclaimers Addressing Future Performance
### CLOSING ACKNOWLEDGMENT

*Disclaimer 1*

1. I have not received any information, either verbal or written, regarding the sales, revenues, earnings, income or profits of PEABERRY COFFEE franchised stores ("Stores") from any officer, employee, agent or area sales representative of PCFI, except as set forth in Item 19 of PCFI's Offering Circular.

*Disclaimer 2*

2. I have not received any assurances, promises or predictions of how well my PEABERRY COFFEE Store will perform financially from any officer, employee, agent or area sales representative of PCFI, except as set forth in Item 19 of PCFI's Offering Circular.

### FRANCHISE AGREEMENT

*Disclaimer 3*

24.13 Acknowledgement

(B) NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED....

### UNIFORM FRANCHISE OFFERING CIRCULAR

*Disclaimer 4*

ITEM 19

EARNINGS CLAIMS

Attached, as Exhibit J is our Statement of Earnings. Except as presented in Exhibit J we do not furnish or authorize our salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a PEABERRY COFFEE Store. Actual results may vary from unit to unit, and we cannot estimate the results of any particular franchise. We have specifically instructed sales personnel, agents, employees and officers that they are not permitted to make claims or statements as to earnings, sales or profits or prospects or chances of success other than as presented in Exhibit J, nor are they authorized to represent or estimate dollar figures as to any particular PEABERRY COFFEE Store. You should not rely on unauthorized representations as to earnings, sales, profits or prospects or chances of success.

**Disclaimer 5**

CAUTION: THE FOLLOWING DATA SHOULD NOT BE CONSIDERED AS THE ACTUAL OR POTENTIAL INCOME OR RESULTS OF OPERATIONS OF ANY PARTICULAR FRANCHISE. WE DO NOT REPRESENT THAT YOU CAN EXPECT TO ATTAIN THESE GROSS SALES LEVELS. A FRANCHISEE'S FINANCIAL RESULTS ARE LIKELY TO DIFFER FROM THE FIGURES PRESENTED.

**Disclaimer 6**

EXCEPT FOR THE INFORMATION IN THIS ITEM, NO REPRESENTATIONS OR STATEMENTS OF ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL SALES, COSTS, INCOME OR PROFITS ARE MADE TO FRANCHISEES BY US. WE DO NOT FURNISH OR MAKE, OR AUTHORIZE OUR SALES PERSONNEL TO FURNISH OR MAKE, ANY ORAL OR WRITTEN INFORMATION CONCERNING THE ACTUAL, AVERAGE, PROJECTED, FORECASTED OR POTENTIAL SALES, COSTS, INCOME OR PROFITS OF A FRANCHISE OR PROSPECTS OF CHANCES OF SUCCESS THAT ANY FRANCHISEE CAN EXPECT OR THAT PRESENT OR PAST FRANCHISEES HAVE HAD, OTHER THAN AS SET FORTH IN THIS ITEM. WE DISCLAIM AND WILL NOT BE BOUND BY ANY UNAUTHORIZED REPRESENTATIONS.

## II. Disclaimers Addressing Business Risk
### CLOSING ACKNOWLEDGMENT

**Disclaimer 7**

3. I have made my own independent determination that I have adequate working capital to develop, open and operate my Store.

**Disclaimer 8**

8. I acknowledge that the success of my PEABERRY COFFEE Store depends in large part upon my ability as an independent business person and my active participation in the day-to-day operation of the Store.

### FRANCHISE AGREEMENT

**Disclaimer 9**

24.13 Acknowledgement

(A) THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON THE FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

## III. Broad General Disclaimers
### CLOSING ACKNOWLEDGMENT

**Disclaimer 10**

5. I am not relying on any promises of PCFI which are not contained in the PCFI franchise agreement.

### FRANCHISE AGREEMENT

**Disclaimer 11**

24.2 Entire Agreement.

This Agreement, including all exhibits and addenda, contains the entire agreement between the parties and supersedes any and all prior agreements concerning the subject matter hereof. The Franchisee agrees and understands that the Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution hereof or for claims of negligent or fraudulent misrepresentation and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. The Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. The Franchisee further acknowledges and agrees that no representations have been made to it by the Franchisor regarding projected sales volumes, market potential, revenues, profits of the Franchisee's PEABERRY COFFEE Store, or operational assistance other than as stated in this Agreement or in any disclosure document provided by the Franchisor or its representatives.

*Disclaimer 12*

24.13 Acknowledgement.

(C) NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY OFFERING CIRCULAR SUPPLIED TO THE FRANCHISEE IS BINDING ON THE FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.