**Roberta BERGER, Plaintiff–Appellee and Cross–Appellant,**

v.

**SECURITY PACIFIC INFORMATION SYSTEMS, INC., Defendant–Appellant and Cross–Appellee.**

**No. 88CA0822.**

Colorado Court of Appeals, Div. IV.

April 5, 1990.

William E. Myrick, P.C., William E. Myrick, Gregory B. Washington, Andrew T. Brake, P.C., Andrew T. Brake, Denver, for plaintiff-appellee and cross-appellant.

Holme Roberts & Owen, Edmond F. Noel, Jr., Katherine J. Peck, Denver, for defendant-appellant and cross-appellee.

Opinion by Judge HUME.

Defendant, Security Pacific Information Services, Inc., (SPIS) appeals the judgment entered on a jury verdict in favor of plaintiff, Roberta Berger, on a claim for fraudulent concealment arising out of her hiring and termination by SPIS. Berger was hired by SPIS in January 1986, and was terminated some eight months later, after the project she had been hired to manage was discontinued. She contended that SPIS had fraudulently failed to disclose a substantial, known risk that the project would be discontinued in the near future. The jury awarded her both actual and punitive damages on her fraudulent concealment claim. We affirm.

SPIS contends that: (1) as a matter of law, it had no duty to disclose information about its plans and financial condition to a prospective employee; (2) even if it had such a duty, there was insufficient evidence to establish a breach; (3) nondisclosure by SPIS was not the cause of Berger's financial losses; and (4) the evidence did not support an award of punitive damages.

The evidence, viewed in the light most favorable to Berger, see Vigil v. Pine, 176 Colo. 384, 490 P.2d 934 (Colo.1971), established the following. Security Pacific Corporation (SPC), the parent corporation of SPIS, acquired SPIS in June 1984 from a corporation that was then in bankruptcy. SPIS was not profitable when acquired by SPC, and a new president, Mitchell, was hired to "turn the company around."

In 1985, in order to use some of SPIS's excess computer capacity, its management personnel decided to offer disaster recovery services to companies dependent on computers in their operations. Disaster recovery services provide backup computer facilities to allow businesses to continue to operate after damage to their computer systems.

SPIS's disaster recovery service, named Recovery Plus, suffered severe financial losses in 1985. SPIS's management personnel knew that its annual revenues fell far short of projections, and that the shortfall amounted to $61,000 for December alone. Recovery Plus's revenues continued to fall short of projections in the first quarter of 1986.

SPIS as a whole also suffered a poor financial performance in 1985. It sustained an after tax loss of $2.3 million despite severe cost cutting measures. Increasing losses in six figures per month continued into 1986.

Despite the poor financial performance of SPIS and Recovery Plus, SPIS's managers began developing a plan for the revitalization of Recovery Plus in the fall of 1985. They knew that starting a disaster recovery service would require "a significant commitment of capital resources," and estimated annual costs at between $700,000 to over $1 million. They estimated that it would take nearly two years to break even. They also questioned whether the expenses would be worth the additional revenue, and whether the funds and resources required could be used in a more profitable venture.

The minutes of a meeting held to discuss the plan on September 11, 1985, conclude with a statement that "Mike [Mitchell] would like to see a detailed plan for disaster recovery from now until March 1, 1986 —if we don't meet that plan, we will shut the product down," and a management memo dated October 1, 1985, described the condition of Recovery Plus as "very rough." Thus, from the information available at the end of 1985, SPIS's managers knew there was a substantial risk that Recovery Plus would be discontinued.

In spite of the serious problems in its financial circumstances, SPIS continued its attempts to rehabilitate the Recovery Plus project, and it engaged a corporate recruiter to find a sales manager for that project. On November 15, 1985, the recruiter contacted plaintiff, who was then living in New Orleans where she was working to start her own disaster recovery business.

She initially interviewed with SPIS in December 1985.

During the interview, Mitchell told plaintiff that SPIS had recently been acquired from a company in bankruptcy, and that it was losing money, although he did not say how much. When plaintiff asked Mitchell about the company's financial status, he told her that SPIS had no detailed financial records but that it was a wholly owned subsidiary of SPC, and he referred her to an annual report showing SPC to be a multi-million dollar company. Mitchell also referred Berger to a magazine article which stated that SPIS had so many Recovery Plus customers that it had to turn away business.

In fact, SPIS had only two or three regular customers under contract for disaster recovery services. Although Mitchell knew that his own job was at risk because of the company's poor performance, he told Berger that his corporate life at SPIS was just beginning. He also told her he had a strong personal commitment to Recovery Plus, but did not tell her of the risk that the project might be discontinued in March.

After a second interview in January, SPIS offered Berger a position as sales manager for Recovery Plus on January 16, 1986, at an annual salary of $45,000. She accepted, and began work as an at-will employee on February 10, 1986.

On March 31, 1986, some seven weeks after plaintiff started work, SPIS discontinued Recovery Plus because a newly developed accounting system showed that the project was losing $856,000 a year. The new accounting system also showed other unprofitable areas in SPIS. As a result, between May and September 1986, SPIS terminated 38 employees, and sought replacements for only nine.

Because plaintiff expressed concern about her job security, Mitchell assured her that she had nothing to worry about and that she would always have a place with the company. After hearing these assurances, plaintiff bought a house in Denver with financing through SPC. Mitchell gave her temporary assignments including an unsuccessful attempt to start a disaster recovery service limited to users of certain types of equipment. However, SPIS continued to perform poorly, and Mitchell was replaced on September 5, 1986. Berger was terminated six days later.

After her termination, plaintiff defaulted on her home loan, and eventually sold the house for a loss. She incurred expenses moving to the east coast, where her husband had found employment, and was out of work until March 1987. She was intermittently employed until the trial.

I.

SPIS contends that it had no duty to disclose any financial information or plans about Recovery Plus to plaintiff when she interviewed for a position as Recovery Plus sales manager. Under the circumstances presented by this record, we disagree.

To establish a claim for fraudulent concealment or non-disclosure, the plaintiff must show that the defendant had a duty to disclose the information. *See Bair v. Public Service Employees Credit Union*, 709 P.2d 961 (Colo.App.1985). Whether a defendant had a duty to disclose a particular fact is a question of law. *See Van Winkle v. Transamerican Title Insurance Co.*, 697 P.2d 784 (Colo.App.1984).

Stated generally, a person has a duty to disclose to another with whom he deals facts that "in equity or good conscience" should be disclosed. *See Eckley v. Colorado Real Estate Commission*, 752 P.2d 68 (Colo.1988). Under *Restatement (Second) of Torts* § 551(2)(e)(1965), one party to a business transaction has a duty to disclose to the other "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect a disclosure of those facts." *Bair v. Public Service Employees Credit Union, supra*. More specifically, a party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed. *Cahill v. Readon*, 85 Colo. 9, 273 P. 653 (1928). *See Restatement (Second) of Torts* § 551(2)(b) (1965).

**1384**

■ Here, there was evidence that Mitchell made statements indicating that SPIS was financially secure because it had the backing of SPC, and that Recovery Plus was a potentially successful project with a bright future. These statements would create a false impression without disclosure of the known, serious financial problems of SPIS and the known, substantial risk that Recovery Plus would be discontinued in the near future. SPIS recruited Berger specifically to manage sales for Recovery Plus, and induced her to move to Denver from New Orleans and give up her attempt to start her own business. Under these circumstances, a substantial, known risk that Recovery Plus would be discontinued in a few weeks was a fact that "in equity or good conscience" should have been disclosed. *See Eckley v. Colorado Real Estate Commission, supra.* Thus, we conclude that the trial court did not err in submitting the fraudulent concealment claim to the jury.

SPIS argues that imposition of a duty of disclosure to prospective employees undermines the rule that an employee for an indefinite period may be terminated at will. We disagree.

■ An employer's right to terminate an at-will employee at any time without cause is not inconsistent with an action for fraudulently inducing such employee's acceptance of employment. *See Bernoudy v. Dura–Bond Concrete Restoration, Inc.,* 828 F.2d 1316 (8th Cir.1987); *Redies v. Nationwide Mutual Insurance Co.,* 711 F.Supp. 570 (D.Colo.1989); *Sea–Land Service, Inc. v. O'Neal,* 224 Va. 343, 297 S.E.2d 647 (1982). *But see, e.g., Shelby v. Zayre Corp.,* 474 So.2d 1069 (Ala.1985). An employer's right to terminate an at-will employee without cause does not protect the employer from liability for fraud in inducing the employee to accept employment.

SPIS also argues that a duty to disclose confidential plans and financial information to prospective employees cannot be imposed because it would create an undue risk that competitors may obtain the information. Although this argument has some merit in the abstract sense, we are not persuaded as to its pertinence under the circumstances here.

■ A prospective employer may not have a duty to disclose its financial condition to every job applicant it interviews. However if, as here, its representations concerning its own financial prospects and the applicant's future employment prospects reasonably induce a false impression as to those material factors in the mind of the interviewee, a duty of full disclosure arises. *See Ackmann v. Merchants Mortgage & Trust Corp.,* 645 P.2d 7 (Colo.1982); *Cahill v. Readon, supra.*

SPIS's reliance on *Stowman v. Carlson Companies, Inc.,* 430 N.W.2d 490 (Minn. App.1988) is misplaced. There, the court held that the defendant had no duty to inform a prospective employee of a subsidiary that the subsidiary might be sold. In *Stowman,* however, the defendant had a duty of confidentiality imposed upon its release of the information in question by operation of federal securities regulations.

Here, no countervailing duty of confidentiality has been shown. In addition, in this case, unlike the circumstances in *Stowman,* SPIS actively recruited the plaintiff to fill the sales manager position rather than simply acting upon an unsolicited application for employment. We conclude that the risk of disclosure to competitors does not preclude imposition of a duty to disclose in this case.

We also find no merit in SPIS's argument that, because the information concerned future contingencies, there was no duty to disclose. The undisclosed information was a then-existing known risk of a future contingency. Under the facts and circumstances of this case, SPIS had a duty to disclose that risk to plaintiff.

## II.

SPIS contends that there was insufficient evidence that it breached a duty to disclose. We disagree.

A verdict will not be overturned on appeal if the record, viewed in the light most favorable to the prevailing party, contains competent evidence supporting the jury's

findings. *City of Aurora v. Loveless*, 639 P.2d 1061 (Colo.1981).

■ The elements of fraudulent concealment are: (1) the defendant's concealment of a material existing fact that in equity or good conscience should be disclosed, (2) the defendant's knowledge that the fact is being concealed, (3) the plaintiff's ignorance of the fact, (4) the defendant's intent that the plaintiff act on the concealed fact, and (5) the plaintiff's action on the concealment resulting in damage. *Eckley v. Colorado Real Estate Commission, supra; Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (Colo.1937).

■ Here, there was evidence that Mitchell knew, when he interviewed Berger, that SPIS was operating at a loss, that there was a substantial risk that Recovery Plus would be discontinued in the near future, and that his own job was at risk because of the company's poor financial performance.

Berger was an experienced businesswoman familiar with the difficulties of starting a disaster recovery business, but she did not know, when she accepted the job with SPIS, that there was a substantial risk that SPIS would discontinue its disaster recovery service in the near future. She testified that she would not have accepted the job had she known of that risk.

Although Mitchell and other SPIS employees testified that they informed plaintiff of the company's financial situation, that her job was entrepreneurial in nature, and that there were no guarantees, a jury's assessment of the probative value of such evidence cannot be disturbed on appeal. *See Vigil v. Pine, supra.*

We conclude that there was sufficient evidence that SPIS breached its duty of disclosure to support the jury's verdict.

### III.

SPIS contends that the failure to disclose did not cause Berger's financial losses. We disagree.

The jury awarded $91,631 in actual damages, the precise amount estimated by Berger's expert witness. The amount included $57,857 in lost earnings from Berger's termination until January 1, 1989, and $25,040 for losses on the house plaintiff bought in Denver.

■ SPIS argues that the lost earnings were not the result of the failure to disclose, because Berger had no income when she accepted the job and no guarantee of continued employment with SPIS. We disagree.

Although Berger had no income when she interviewed with SPIS, she had marketable skills and experience for which SPIS was willing to pay $45,000 a year. Although her employment was terminable at will, SPIS was pleased with her work, and she had a good personal relationship with management. The jury could reasonably infer from the evidence that Berger's employment would have continued for a reasonable time had Recovery Plus been as successful as represented by SPIS. *See generally Slack v. Sodal*, 190 Colo. 411, 547 P.2d 923 (1976); *Colorado Performance Corp. v. Mariposa Associates*, 754 P.2d 401 (Colo.App.1987).

In view of president Mitchell's expression of a personal commitment to "turn the venture around," coupled with other evidence that such a turnaround might reasonably require in excess of two years, we conclude that the jury's award was reasonable.

■ SPIS also argues that the failure to disclose was not the cause of Berger's loss on the house she bought in Denver. Berger bought the house after learning that SPIS had discontinued Recovery Plus, and SPIS argues that she failed to mitigate damages. We disagree.

The defense of failure to mitigate damages applies when a plaintiff has failed to exercise reasonable care and diligence to minimize or lessen damages occasioned by defendant's conduct. *Valley Development Co. v. Weeks*, 147 Colo. 591, 364 P.2d 730 (1961); *Martin v. Porak*, 638 P.2d 853 (Colo.App.1981). A plaintiff's failure to mitigate damages is excused, however, if there were reasonable grounds for the failure. A defendant's assurances that the wrong will be remedied is a sufficient justification for a plaintiff's failure to mitigate, if there were reasonable grounds for believing the assurances. *See* C. McCormick,

**1386**

*Law of Damages* § 38 (1935); 22 Am. Jur.2d *Damages* § 504 (1988).

Here, after SPIS discontinued Recovery Plus, Mitchell, the president of the company, told Berger that she need not be concerned about her job and that she would always have a place with the company. On appellate review, we cannot conclude that Berger's reliance on those assurances was unreasonable.

### IV.

SPIS contends that there was insufficient evidence to support the award of punitive damages. We disagree.

Under § 13–21–102(1)(a), C.R.S. (1987 Repl.Vol. 6A), a party who is awarded actual damages may also be awarded exemplary damages if the injury complained of is attended by "circumstances of fraud, malice, or willful or wanton conduct." Here, because plaintiff was awarded actual damages on her fraudulent concealment claim, an award of punitive damages was authorized. The jury's finding that the elements of fraud were established also established the "circumstances of fraud" required for punitive damages. *See Amber Properties, Ltd. v. Howard Electrical & Mechanical Co.*, 775 P.2d 43 (Colo.App.1988).

Under § 13–25–127(2), C.R.S. (1987 Repl. Vol. 6A), the plaintiff must prove circumstances of fraud beyond a reasonable doubt. *Tri–Aspen Construction Co. v. Johnson*, 714 P.2d 484 (Colo.1986). Here, there was evidence that the president of SPIS knew there was a substantial risk that Recovery Plus would be discontinued, but failed to inform Berger of the risk, and instead, led her to believe the opposite. We conclude that the evidence was sufficient to establish circumstances of fraud beyond a reasonable doubt.

Because we have upheld the judgment, we do not address the issues raised in plaintiff's cross-appeal.

The judgment is affirmed.

JONES and REED, JJ., concur.