24CA1392 Schmitz v BBVA 12-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1392
El Paso County District Court No. 21CV31746
Honorable David Prince, Judge

---

Scott Schmitz, Sandy Schmitz, Louis Taloumis, Lori Taloumis, Brandon Tripp, Jill Tripp, Michael Zachar, and Kelly Clarkson,

Plaintiffs-Appellants,

v.

BBVA USA Bancshares, Inc., BBVA USA, Ashley Burgan, and Scott Smith,

Defendants-Appellees.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 31, 2025

---

First & Fourteenth PLLC, Edward A. Gleason, Julian R. Ellis, Jr., Colorado Springs, Colorado; Boyd Powers & Williamson, Derek S. Boyd, Decatur, Texas, for Plaintiffs-Appellants

Ballard Spahr LLP, Matthew A. Morr, Andrew Valencia, Denver, Colorado, for Defendants-Appellees BBVA USA Bancshares, Inc. and BBVA USA

Timothy F. Brewer PC, Timothy F. Brewer, Colorado Springs, Colorado, for Defendants-Appellees Ashley Burgan and Scott Smith

¶ 1      Plaintiffs, Scott and Sandy Schmitz, Louis and Lori Taloumis, Brandon and Jill Tripp, and Michael Zachar and Kelly Clarkson (collectively, borrowers), appeal the district court's order granting summary judgment in favor of defendants, BBVA USA Bancshares, Inc., its subsidiary BBVA USA, and its employees Ashley Burgan and Scott Smith (collectively, lender).[1]  We affirm in part and reverse in part and remand the case for further proceedings.

## I.      Background

¶ 2      Between 2018 and 2019, borrowers separately met and contracted with David Riggle, who owned JP Cooper Construction (collectively, builder), to construct homes on vacant lots in Colorado Springs.  In 2019, borrowers each signed a loan agreement with lender to finance construction.  In August 2020, Riggle notified borrowers that he would be filing for personal bankruptcy and that JP Cooper Construction would not finish construction of their homes.  It was discovered later that Riggle had misappropriated borrowers' money to pay off other debt; he pleaded guilty to a

---

[1] The individual defendants, Ashley Burgan and Scott Smith, have adopted BBVA's arguments on appeal, so we refer to the defendants collectively as "lender."

1

criminal theft charge and was ordered to pay restitution to borrowers.

¶ 3     In October 2021, borrowers sued lender, asserting claims for violation of the Colorado Consumer Protection Act (CCPA), fraud, fraudulent concealment, negligent misrepresentation, negligence, unjust enrichment, and civil conspiracy.  The theory underlying borrowers' claims was that, before borrowers hired builder and signed loan agreements financing builder's construction of their homes, lender made false or misleading representations about builder and failed to disclose pertinent information about builder being a financial risk.

¶ 4     Lender filed a C.R.C.P. 12(b)(5) motion to dismiss borrowers' claims.  Judge David Miller, the district court judge then assigned to the case, determined that any claims based on lender's disbursements of loan proceeds or related to builder's construction efforts were barred by the terms of the loan agreement but allowed the remaining claims to proceed.

¶ 5     As discussed in detail in Part III.A.2 below, lender later filed a C.R.C.P. 56 motion for summary judgment.  Judge David S. Prince, the district court judge then assigned to the case, granted the

motion and entered summary judgment against borrowers on all claims.  Borrowers appeal that order.

## II.    Summary Judgment Standard of Review

¶ 6    We review de novo an order granting summary judgment. *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 13.  "Summary judgment is only proper when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 2020 CO 51, ¶ 19 (quoting C.R.C.P. 56(c)).  In resolving a motion for summary judgment, the trial court must grant the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and must resolve all doubts against the moving party.  *Id.* at ¶ 20.  Summary judgment is a drastic remedy and should only be granted when the applicable legal standards have been clearly met.  *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶¶ 19, 21.

### III. Analysis

¶ 7     Borrowers contend that the district court erred by (1) concluding that the loan agreement precludes all their claims; (2) determining that lender neither owed nor breached a duty to disclose additional information; (3) resolving disputes of material fact against them; and (4) concluding that the credit agreement statute of frauds barred their claims. With one exception, we agree that summary judgment was inappropriate.

#### A.     Interpretation of the Loan Agreement

¶ 8     Borrowers contend that the district court erred by concluding that the loan agreement precludes their claims. We largely agree.

#### 1.     Relevant Loan Agreement Provisions

¶ 9     Each borrower executed a loan agreement with lender containing the following exculpatory provision (exculpatory provision):

> The Builder is acting as an independent contractor in the completion of the improvements to the Property. The Builder will at all times maintain current General Liability Insurance and Worker's Compensation (if required by state guidelines) satisfactory to the Lender and provide evidence thereof. If at any time during the construction phase of the Loan any of the above listed

4

insurance policies are canceled or revoked, the Lender, at its sole option, shall have the right to force place the proper coverage at the expense of the Borrower and/or Builder. The Lender assumes the Borrower has performed a diligent investigation of the Builder and the results are satisfactory to the Borrower.

***The Borrower accepts full responsibility for the selection of the Builder. Lender approval of the Builder is for the sole benefit of the Lender and neither the Borrower nor the Builder shall be entitled to claim any loss or damage as the result of such an approval. The Lender makes no guarantees or assurances as to the quality or craftsmanship to be performed by the Builder. The Borrower hereby agrees to indemnify and hold harmless the Lender as a result of the Borrower choosing to contract with the Builder for the purpose of constructing improvements on the Property, including the Borrower's authorization to allow funds, as hereinafter defined, to be disbursed directly to the Builder.***

¶ 10 Each loan agreement also allowed lender to disburse the loan proceeds directly to builder and included the following disbursement-related indemnification provision (indemnification provision):

The Borrower hereby releases and agrees to save, defend, indemnify and hold harmless the Lender and its directors, officers, employees, and agents, from and against any and all loss,

liability, costs, damages, expenses, claims, actions, suits and causes of action of any kind or nature whatsoever (whether or not caused by or resulting from, in whole or in part by [sic] the Lender's own negligence) including without limitation reasonable attorney's fees resulting from, relating to or arising out of the Lender's making disbursements of Funds directly to the Builder rather than directly to the Borrower or jointly to the Borrower and Builder.

¶ 11    Each loan agreement contained the following language as part of an integration clause (integration clause):

This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding between the parties, supersedes all prior agreements and understandings related to the subject matter hereof and thereof, and may not be amended except by written agreement between the Borrower, Builder and the Lender. No oral promise, agreement, representation or statement may be relied upon or have any effect whatsoever unless reduced to writing and executed by the party against whom such statement is to be enforced.

¶ 12    Finally, two of the borrower couples signed a loan disclosure document that included the following disclaimer (disclosure disclaimer):

The borrower is **solely responsible** for investigating and choosing the builder. Once you choose your builder, [lender] will review your builder to determine whether the builder

6

meets our requirements.  Our satisfactory review of the builder does not constitute a recommendation from us or a guarantee of the quality, integrity and craftsmanship of the builder.  YOU SHOULD NOT RELY ON OUR SATISFACTORY REVIEW OF THE BUILDER FOR DETERMINING YOUR CHOICE OF A BUILDER.

### 2. District Court Judges' Competing Interpretations

¶ 13    In March 2022, lender moved to dismiss borrowers' complaint, arguing in relevant part that all claims were barred by the exculpatory provision in the loan agreement because borrowers expressly agreed to "accept[] full responsibility for the selection of the Builder."  Lender argued that the combined effect of the exculpatory provision and the integration clause was to preclude borrowers from "asserting claims related to alleged statements recommending [builder] made prior to the Loan Agreements."  Lender also argued that the indemnification provision barred any claims related to its disbursement of loan proceeds.

¶ 14    In opposing the motion, borrowers argued that exculpatory provisions purporting to relieve parties of their own intentional conduct were unenforceable under Colorado law.  And they argued that the loan agreement provisions that lender cited did not include

sufficiently clear language to disclaim borrowers' reliance on undisclosed material information or to defeat their claims for fraud and negligent misrepresentation.

¶ 15    The district court, through Judge Miller, granted lender's motion in part.  First, the court reasoned that the exculpatory provision "relate[d] to holding [lender] harmless for the selection of the builder *as it relates to the builders' construction of the property, quality of craftsmanship, etc.,* as opposed to [lender's] own misrepresentations recommending the builder."  (Emphasis added.)  The court concluded that the loan agreement absolved lender "from liability based on the actions of the builder during the construction of the home[,] including payment disbursements made to the builder," and dismissed borrowers' claims "[t]o the extent [they] are based on post-contract disbursements . . . or actions by the builder in performing his duties."

¶ 16    Second, the court reasoned that the loan agreement did "not specifically release [lender] from liability due to [lender's] own negligent misrepresentations regarding the builder's past conduct (that [borrowers] could not have known about) prior to [borrowers'] selection of the builder in order to induce them to select the

builder." It also reasoned that the integration clause did "not affect a waiver of a claim of negligent misrepresentation *not specifically prohibited by the terms of the agreement.*" Thus, the court concluded that the loan agreement did not bar borrowers' remaining claims related to lender's alleged misrepresentations and concealment.

¶ 17 Following the court's ruling on lender's motion to dismiss, the parties litigated the case for more than two years. In May 2024, lender moved for summary judgment, renewing its argument that the exculpatory provision precluded all claims because borrowers agreed to "accept full responsibility for the selection of the Builder." This time, lender highlighted the exculpatory provision's language providing that "Lender approval of Builder is for the sole benefit of Lender" and that borrowers were not "entitled to claim any loss or damage as the result of such an approval." Lender argued that borrowers' misrepresentation and concealment claims related to lender's approval of builder such that the claims were barred by the exculpatory provision. Lender again argued that the integration clause precluded borrowers from pursuing claims based on any alleged misrepresentations, even precontractual ones.

9

¶ 18    Borrowers opposed summary judgment on many of the same grounds that they had opposed lender's motion to dismiss. They explained that at "the heart of [their] claims are the pre-loan representations and nondisclosures about [builder], which induced [borrowers] to hire or maintain [builder] as their builder and enter into the loan agreements." They endorsed Judge Miller's view that the exculpatory provision only precluded claims relating "to quality of the builder's craftsmanship and other post-contract conduct." They maintained their argument that Colorado law did not permit lender to relieve itself of liability for its own intentional conduct. And they continued to assert that the loan agreement's provisions were not specific enough to exculpate lender from its own precontractual false and misleading representations or to disclaim borrowers' reliance on lender's nondisclosures.

¶ 19 The district court, through Judge Prince, granted the motion for summary judgment.[2] The court acknowledged that borrowers sought to hold lender liable "because Lender *represented* to them that Builder was an 'approved' builder *but failed to reveal* to them facts Lender had learned or should have learned in its financial evaluations of Builder" and made "*affirmative misrepresentations* of fact." (Emphasis added.) But it characterized borrowers' claims as "deriv[ing] from their central theory that Lender should be legally responsible to them for Builder's misappropriation of funds *because*

---

[2] Judge Prince declined to adhere to Judge Miller's prior ruling on lender's motion to dismiss as law of the case. *See Stockdale v. Ellsworth*, 2017 CO 109, ¶ 37 ("[T]he law of the case doctrine 'provides that prior relevant rulings made in the same case are to be followed unless such application would result in error or unless the ruling is no longer sound due to changed conditions.'" (citation omitted)). Judge Prince reasoned in part that Judge Miller had decided the lender's motion to dismiss under the plausibility standard for C.R.C.P. 12(b)(5) motions rather than the standard governing C.R.C.P. 56 motions. *See Barnes v. State Farm Mut. Auto. Ins. Co.*, 2021 COA 89, ¶ 24 (a C.R.C.P. 12(b)(5) motion asks the court to determine whether the complaint states a plausible claim for relief); *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 2020 CO 51, ¶ 19 (summary judgment is appropriate when the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (quoting C.R.C.P. 56(c))). But contract interpretation is always a question of law, *see Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9, so we fail to see how the type of motion lender filed should have driven the analysis.

11

*Lender 'approved' Builder.*" (Emphasis added.) The court explained that, by selecting builder, borrowers explicitly contracted to accept liability and to "bar themselves from bringing claims against Lender for the 'approval' issued by Lender — even agreeing to indemnify Lender against such claims."

¶ 20 The court concluded that the exculpatory provision clearly and unambiguously barred all claims, focusing on the following language:

- "Lender approval of the Builder is for the sole benefit of the Lender and neither the Borrower nor the Builder shall be entitled to claim any loss or damage as the result of such an approval."
- "Borrower hereby agrees to indemnify and hold harmless the Lender as a result of the Borrower choosing to contract with the Builder . . . ."

The court reasoned that the quoted language, "[t]aken individually or as a whole, . . . reflects the parties' intent to assign exclusively to [borrowers] the risks of loss flowing from the evaluation and selection of the builder" and precludes borrowers from bringing "a claim for damages based on the approval of a specific builder by

12

Lender." The court also determined that the disclosure disclaimer (signed by two of the borrower couples) supported this rationale.

¶ 21 The court was not persuaded by borrowers' argument (and Judge Miller's reasoning) that the exculpatory provision barred only those claims relating to builder's construction work. Instead, the court determined that the exculpatory provision "lists two categories of claims being barred," those based on lender's approval and those based on builder's construction. The court was likewise unpersuaded that the "indemnify and hold harmless" language in the exculpatory provision was limited to claims based on lender's disbursement of loan proceeds, noting that such a claim was merely an example of the types of claims covered by the provision.

¶ 22 The court entered summary judgment against borrowers on their claims on the following grounds:

- Fraud and negligent misrepresentation: Any claim based on lender's representation that builder was "approved" failed as a matter of law because the statement was not a misrepresentation of fact — it was undisputed that lender in fact "approved" builder for borrowers' loan agreements. Any claim based on lender's representation that builder was

approved "based on his financials" was (1) not supported by "a discussion of actual facts that rendered the statement false" and (2) barred by the exculpatory provision because it was based on lender's "approval" of builder.

- Fraudulent concealment: Borrowers' claim that lender's representations about approving builder were "misleading and not the whole truth" due to its failure to disclose other information that lender knew involved genuine disputes of material fact. Nonetheless, any nondisclosure claim failed because (1) borrowers "contracted away any such claim" under the exculpatory provision, and (2) the "undisputed material facts" did not support a duty to disclose or a breach of that duty.

- CCPA: Borrowers' "theory of a deceptive trade practice [was] the allegation of misrepresentation and failure to disclose regarding the 'approved' status of Builder." The claim failed because "no allegation of an affirmative misrepresentation or failure to disclose has been supported."

- Negligence: Borrowers' claim that lender was negligent because it "violat[ed] [its] own internal procedures and

standards in regards to granting 'approval' status to Builder" was barred by the exculpatory provision.

- Unjust enrichment: Because borrowers' unjust enrichment claim was "a separate legal theory based on the allegations of misrepresentation and nondisclosure," it failed for lack of an affirmative misrepresentation or a failure to disclose.

- Civil conspiracy: Because borrowers' civil conspiracy claim was "grounded on the Lender's granting of 'approved' status to Builder," it was barred by the exculpatory provision.

### 3. Principles of Contract Interpretation

¶ 23    The interpretation of a loan agreement, like any other contract, is a question of law that we review de novo. *See Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9. When interpreting a contract, we aim to give effect to the intent of the parties by construing the contract as a whole and giving effect to all its provisions. *E-470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002). In doing so, our "duty is to interpret and enforce contracts as written between the parties, not to rewrite or restructure them." *Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998). Contractual language is "examined and

15

construed in harmony with the plain and generally accepted meaning of the words employed." *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000).

### 4. The District Court Erred by Interpreting the Loan Agreement to Preclude All Claims

¶ 24 Borrowers contend that the district court erred by interpreting the loan agreement to bar all claims because the exculpatory provision (1) cannot shield lender from liability for its own intentional misconduct and (2) does not clearly and unequivocally preclude their claims. Except for the negligence claim, we agree.

#### a. Lender Cannot Shield Itself from Liability for Its Own Intentional Misconduct

¶ 25 Borrowers contend that the district court erred by interpreting the loan agreement as allowing lender to shield itself from liability for its own intentional misconduct. We agree.

¶ 26 An exculpatory provision is not enforceable if it is contrary to public policy. *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 13. And the supreme court has clarified that "the public policy of this state precludes making an agreement to indemnify an actor for damages resulting from his own 'intentional or willful wrongful acts.'" *Constable v. Northglenn, LLC*, 248 P.3d

16

714, 716 (Colo. 2011) (citation omitted); *accord Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. App. 2002) ("Public policy prohibits 'indemnifying a party for damages resulting from intentional or willful wrongful acts.'" (citation omitted)). As a result, courts in this state "will not enforce exculpatory and limiting provisions . . . if they purport to relieve parties from their own . . . intentional conduct." *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008); *accord Equitex, Inc.*, 60 P.3d at 750 ("A court will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties."); *see also* Restatement (Second) of Contracts § 195 (A.L.I. 1981) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.").

¶ 27    When it entered summary judgment against borrowers, the district court did not consider whether the exculpatory provision violates public policy to the extent that it purports to insulate lender from liability for its own intentional misconduct. Instead, the court focused on whether lender's alleged misconduct involved the subject matter of the exculpatory provision, which the court interpreted as precluding any claim related in any way to lender's

17

"approval" of builder. Regardless of whether lender's allegedly fraudulent misrepresentations and nondisclosures related to its "approval" of builder, lender cannot relieve itself of liability for intentional misconduct through the exculpatory provision. *See Rhino Fund, LLLP*, 215 P.3d at 1191. Consequently, the court erred by concluding that the exculpatory provision precluded borrowers' intentional tort claims for fraud, fraudulent concealment, and civil conspiracy.

b. The Loan Agreement Does Not Clearly and Unambiguously Preclude Borrowers' Claim for Negligent Misrepresentation

¶ 28    Borrowers contend that the district court erred by concluding that the exculpatory provision clearly and unambiguously precludes their negligence-based claims. With respect to the claim for negligent misrepresentation, we agree. But we affirm the court's entry of judgment on the negligence claim.

¶ 29    Exculpatory provisions that attempt to insulate a party from liability for its own negligence are generally disfavored and must be closely scrutinized and strictly construed against the party seeking to limit its liability. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981); *McShane v. Stirling Ranch Prop. Owners Ass'n*, 2017 CO 38,

18

¶ 18. To determine whether an exculpatory provision is valid, we consider "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376. "The determination of the sufficiency and validity of an exculpatory agreement is a question of law for the court to determine." *Id.*

¶ 30 We conclude that the exculpatory provision does not clearly and unambiguously preclude borrowers' claims that lender negligently misrepresented information about builder before the loan agreements were executed, so we need not address the first three *Jones* factors. *See Doe v. Wellbridge Club Mgmt. LLC*, 2022 COA 137, ¶ 16.

¶ 31 Two different judges interpreted the exculpatory provision in two reasonable but contradictory ways. *See Ad Two, Inc.*, 9 P.3d at 376 ("Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation."). Judge Miller reasoned that the exculpatory provision did not address lender's alleged misrepresentations recommending builder despite builder's past misconduct. Instead, Judge Miller interpreted the

19

provision to preclude claims related to builder's construction of the property being funded by the loan agreement. Given the context in which the exculpatory language is situated, this interpretation is reasonable.

¶ 32 The sentence, "Lender assumes the Borrower has performed a diligent investigation of the Builder and the results are satisfactory to the Borrower," immediately follows, in the same paragraph, a discussion of builder's obligation, as an independent contractor, to maintain liability and workers' compensation insurance. This placement suggests that borrowers' "diligent investigation" of builder relates to whether builder has the requisite insurance coverage if there is a problem with construction or if a worker is injured. The paragraph does not mention builder's financial health or lender's recommendation or approval of builder.

¶ 33 The next two sentences are: "The Borrower accepts full responsibility for the selection of the Builder. Lender approval of the Builder is for the sole benefit of the Lender and neither the Borrower nor the Builder shall be entitled to claim any loss or damage as the result of such an approval." At first blush, this language appears quite broad. But the next sentence provides

additional context: "The Lender makes no guarantees or assurances as to the quality or craftsmanship to be performed by the Builder." This language also suggests that lender's efforts to disclaim liability for "approv[ing]" builder relate to builder's construction efforts, not to lender's own representations regarding builder's financial health.

¶ 34    The paragraph continues: "The Borrower hereby agrees to indemnify and hold harmless the Lender as a result of the Borrower choosing to contract with the Builder for the purpose of constructing improvements on the Property, including the Borrower's authorization to allow funds, as hereinafter defined, to be disbursed directly to the Builder."  The first half of this sentence is consistent with the theme reflected in the rest of the provision — borrower has no remedy against lender for problems with construction.  The second half of the sentence introduces a financial concept, seemingly for the first time — borrower has no remedy against lender for any problem with lender's disbursement of funds directly to builder.

¶ 35    Reading the exculpatory provision as a whole, *see E-470 Pub. Highway Auth.*, 30 P.3d at 801, Judge Miller interpreted it to preclude borrowers from pursuing claims against lender for "actions

by the builder in performing his duties" or "based on post-contract disbursements." But he allowed borrowers to pursue their precontractual misrepresentation and concealment claims because those claims were not specifically prohibited by the terms of the loan agreement. *See Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 74 (Colo. 1991) (contract provisions purporting to prohibit claims of negligent misrepresentation "must be couched in clear and specific language"); *Jones*, 623 P.2d at 376 (limitations on liability must be "expressed in clear and unambiguous language").

¶ 36     For his part, Judge Prince focused on the sentences disclaiming lender liability for "approv[ing]" builder or for borrowers' decision to contract with builder, unmooring that language from the surrounding context about insurance coverage and construction but interpreting it alongside the disclosure disclaimer to bar all of borrowers' claims.[3]  *See U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992) ("The meaning of a

---

[3] Even the disclosure disclaimer seems to reinforce the limited scope of lender's disclaimer of liability: "Our satisfactory review of the builder does not constitute a recommendation from us or a guarantee *of the quality, integrity and craftsmanship of the builder*." (Emphasis added.)

contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation."). This interpretation is also reasonable, so far as it goes, because the exculpatory provision prohibits borrowers from claiming "any loss or damage as the result of" lender's "approval" of builder. To the extent borrowers' damages are "the result of" lender's "approval" of builder, those claims are clearly and unambiguously precluded.

¶ 37 Judge Prince rejected borrowers' argument that lenders' precontractual conduct fell outside the scope of the exculpatory provision because the approval process necessarily occurred before borrowers executed the loan agreements, such that "[a]ny claim based on the approval process would, necessarily, be based on pre-loan actions." Because the provision did not limit its bar on claims in any way, Judge Prince determined that it did not exclude claims based on lender's alleged precontractual misrepresentations and nondisclosure. Although we agree with Judge Prince that the exculpatory provision has no temporal limitation, we decline to adopt his view that the *absence* of language *excluding* precontractual claims means that such claims are precluded. This reasoning flips the analysis on its head. We do not begin by

presuming that all claims are precluded unless excepted; instead, an exculpatory provision must clearly and unambiguously cover the claims at issue. *See Keller*, 819 P.2d at 74.

¶ 38    The fact that two different judges interpreted the exculpatory provision to reach opposing yet reasonable results is likely enough for us to conclude that the parties' intent to preclude borrowers' negligent misrepresentation claim is not "expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376. Even so, for three additional reasons we doubt the exculpatory provision's clarity. *See Fed. Deposit Ins. Corp.*, ¶ 9 (we review contract interpretation de novo).

¶ 39    First, the loan agreement does not define "approval," which could be interpreted to align with either judge's interpretation. The plain and ordinary meaning of the word "approve" is "to have or express a favorable opinion of," "to accept as satisfactory," or "to give formal or official sanction." Merriam-Webster Dictionary, https://perma.cc/XA97-GGPU; *see Certain Underwriters at Lloyd's London Subscribing to Certificate No. 986557 v. Rychel*, 126 P.3d 234, 236 (Colo. App. 2005) (we enforce contracts as written, giving the words and phrases their plain and ordinary meaning); *see also*

24

*City & County of Denver v. Dennis*, 2018 CO 37, ¶ 23 (we may look to the dictionary for assistance in determining the plain and ordinary meaning of words).

¶ 40     Approval by lender could mean that lender endorses builder as one who provides quality construction services.  That meaning would explain why most of the exculpatory provision is focused on ensuring that builder carries appropriate insurance and disclaiming lender liability for construction.  Approval by lender could also mean that lender accepts builder as satisfying its requirements, although whether those requirements relate to the financial health of builder or to some other metric remains unclear.  That meaning, or something like it, appears to be what Judge Prince adopted.

¶ 41     Second, even assuming the term "approval" includes the latter definition — that lender finds builder satisfactory under the criteria it deems relevant — we are not persuaded by Judge Prince's characterization of borrowers' claims as seeking damages that are "the result of" lender's "approval" of builder.  As we understand it, borrowers do not allege that lender's acceptance of builder was a cause of their losses.  Rather, borrowers allege that lender's own affirmative precontractual misrepresentations, misleading

25

representations, and concealment of material information related to its recommendation and approval of builder were causes of their losses. Characterized this way, the claims do not clearly and unambiguously fall within the scope of the exculpatory provision. *See Keller*, 819 P.2d at 74; *Jones*, 623 P.2d at 376.

¶ 42 Third, when closely scrutinized and compared to other provisions of the loan agreement, the exculpatory provision may not insulate lender from its own negligence. *See Jones*, 623 P.2d at 376. To be sure, parties need not use the specific term "negligence" in an exculpatory provision to shield a party from claims based on negligence. *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 785 (Colo. 1989). Instead, as discussed, "[t]he inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Id.*

¶ 43 But another provision of the loan agreement expressly releases lender from liability for its own negligence. Through the indemnification provision, borrowers agreed to indemnify and hold harmless lender from any claims of any kind "whether or not caused by or resulting from, in whole or in part . . . *Lender's own negligence*" related to lender's disbursement of funds to builder.

26

(Emphasis added.)  The indemnification provision demonstrates that when the parties intended to preclude claims based on lender's negligent conduct, they knew how to express that intent clearly. Because the exculpatory provision lacks similarly explicit language absolving lender of liability for its own negligence, we are not convinced it accomplishes that result.

¶ 44 Because the exculpatory provision does not clearly and unambiguously preclude borrowers' claims based on lender's precontractual misrepresentations and nondisclosures, we conclude that the district court erred by entering judgment on this basis on borrowers' negligent misrepresentation claim.[4]  However, the court concluded that borrowers' negligence claim was based on an allegation that lender violated its own internal procedures and standards when approving builder and that such claim fell within the scope of the exculpatory provision.  In their appellate briefs, borrowers do not take issue with the court's characterization of this

---

[4] Even if borrowers' intentional tort claims were not barred by the loan agreement as a matter of public policy, *see supra* Part III.A.4.a., we would also conclude they are not barred to the extent they are based on lender's alleged misrepresentations and nondisclosures for the reasons set forth in this Part III.A.4.b.

claim or otherwise explain how the damages caused by lender's negligence are not "the result of" lender's "approval" of builder. As a result, we affirm the court's entry of judgment against borrowers on their negligence claim.

### B. Duty to Disclose and Reasonable Reliance

¶ 45 Borrowers contend that the district court erred by concluding that lender did not owe or breach a duty to disclose. Although the court disposed of borrowers' claim for fraudulent concealment because "no identifiable duty of disclosure exists nor was such a duty breached," we do not see where in its summary judgment order the court found that no breach occurred.[5] Instead, the court acknowledged that borrowers' "most potentially viable line of argument" was that lender's representations about builder's "approval" were "'misleading and not the whole truth' due to the failure to disclose points of information known to the Lender." And it aptly noted that "some of these specific facts, and more importantly their proper interpretation, are in genuine dispute."

---

[5] Of course, at the summary judgment stage, the district court should not have made findings of fact; rather, it could rely only on undisputed facts to dispose of the claim.

28

¶ 46 But even crediting borrowers' interpretation of the evidence, the court nonetheless concluded that the "undisputed material facts" did not "support the essential elements of [a duty to disclose under Restatement (Second) of Torts (A.L.I. 1977)] section 551(2)(a) and (e)." The court reasoned that borrowers were not entitled to know facts lender knew about builder, nor could they reasonably expect lender to disclose those facts, because they "placed in writing the nature of their relationship regarding investigation, selection, review, and approval" of builder and allocated full responsibility for those tasks to borrowers.

¶ 47 From this reasoning, we understand the court to have determined that (1) lender had no duty to disclose additional information about builder, and (2) the undisputed fact that borrowers executed a loan agreement containing the exculpatory provision and disclosure disclaimer meant they could not establish the reasonable reliance element of a fraudulent nondisclosure claim as a matter of law (not that lender did not breach a duty to disclose as a matter of fact, which clearly remains in dispute). We conclude that the court erred in both respects.

### 1. The District Court Erred by Concluding that No Duty to Disclose Existed

¶ 48   "To establish a claim for fraudulent concealment or non-disclosure, the plaintiff must show that the defendant had a duty to disclose the information." *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. App. 1990).  Whether such a duty exists is a question of law to be determined by the court.  *Barnes v. State Farm Mut. Auto. Ins. Co.*, 2021 COA 89, ¶ 31.  "But the predicate facts must still have been found by judge and jury."  *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 16 (Colo. App. 2010) (citing *Hesse v. McClintic*, 176 P.3d 759, 762 (Colo. 2008)).

¶ 49   "Generally, a person has a duty to disclose to another with whom he deals facts that in equity or good conscience should be disclosed."  *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991).  Before a business transaction is consummated, each party to the transaction has a "duty to exercise reasonable care to disclose" to the other party

> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2); *see Bair v. Pub. Serv. Emps. Credit Union*, 709 P.2d 961, 962 (Colo. App. 1985) (adopting the Restatement).

¶ 50    The duty most clearly implicated by borrowers' claim is the duty to disclose information to prevent prior statements from being misleading. *See* Restatement (Second) of Torts § 551(2)(b); *Berger*, 795 P.2d at 1383 ("[A] party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts

31

are disclosed."). The district court did not expressly consider this duty in its summary judgment order, even though it recognized borrowers' argument that lender's representations about builder's approval were "misleading and not the whole truth."

¶ 51 Even if lender did not initially have a duty to disclose anything to borrowers about its approval of builder because the parties agreed that such approval "is for the sole benefit of the Lender," once lender made affirmative representations to borrowers about that approval that were misleading without the disclosure of additional facts, it assumed a duty of additional disclosure. *See Berger*, 795 P.2d at 1383. Borrowers allege that lender represented that builder had been subjected to an "extensive background check" and an "elevated financial review" and that he was approved for more projects than lender typically approves "based on his financials." Borrowers also allege that lender had concerns about builder's historical and current financial situation and approved builder despite not receiving satisfactory financial information. According to borrowers, without disclosure of this information, lender's statements created a false impression that builder was

32

financially secure and that his financial status even exceeded lender's standards.

¶ 52     Because, at a minimum, lender had a duty to disclose facts to prevent its representations from being misleading, the district court erred by concluding that no duty of disclosure exists to support borrowers' fraudulent concealment claim. *See id.* And because disputes of material fact remain regarding what lender told borrowers and what it knew (and when) about builder — and thus whether any representation necessitated the disclosure of additional information to prevent it from being misleading — the court erred by entering summary judgment on borrowers' claims for fraudulent concealment, violation of the CCPA, and unjust enrichment based on the absence of a duty to disclose. *See Bair,* 709 P.2d at 962 (trial court improperly granted summary judgment where a question of fact remained regarding whether the defendant breached its duty to disclose); *see also Colo. Coffee Bean, LLC,* 251

P.3d at 16 (a judge or jury must find the predicate facts giving rise to a duty to disclose under the circumstances).[6]

### 2. The District Court Erred by Concluding that Borrowers Could Not Establish Reasonable Reliance as a Matter of Law

¶ 53   "Fraudulent nondisclosure requires proof of reasonable reliance on 'the assumption that the concealed fact does not exist,' or 'was different from what it actually was.'" *Colo. Coffee Bean, LLC*, 251 P.3d at 17 (citations omitted).  Whether a person reasonably relied on a nondisclosure is a question of fact.  *See id.*; CJI-Civ. 19:2 (2025) (the elements of a fraudulent nondisclosure claim include that the plaintiff acted or decided not to act relying on the

---

[6] In the section of its answer brief arguing that no duty to disclose exists, lender briefly references the economic loss rule.  Although lender raised the economic loss rule in its motion for summary judgment, the district court did not enter summary judgment on that basis.  Because lender does not develop an economic loss rule argument on appeal, we decline to address it, *see Sanchez v. Indus. Claim Appeals Off.*, 2017 COA 71, ¶ 41, other than to note that lender's misrepresentations and nondisclosures were alleged to have occurred before the loan agreement was executed and are thus independent from any duty owed under the contract, *see Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, ¶¶ 3, 13 ("[P]re-contractual misrepresentations are distinct from the contract itself, and may form the basis of an independent tort claim," because "[t]here is an important distinction between failure to perform the contract itself[] and promises that induce a party to enter into a contract in the first place.").

assumption that the undisclosed fact did not exist or was different from what it actually was and such reliance was justified).

¶ 54      As we understand it, the district court reasoned that the undisputed fact that borrowers entered into the loan agreement, which included the exculpatory provision and disclosure disclaimer, undermined any claim of reasonable reliance.  The court focused on the following:

- language in the disclosure disclaimer (signed by two borrower couples) that deemed borrowers "solely responsible" for "investigating" and "choosing" builder;

- language in the exculpatory provision whereby borrowers accepted "full responsibility for the selection of the builder";

- language in the exculpatory provision that "Lender approval of the Builder is for the sole benefit of the Lender";

- that "[t]he parties stated no obligation of the Lender to disclose any results of its evaluation of the builder"; and

- that "[a]ll parties affirmatively barred [borrowers] from bringing any claim of liability against [lender] for the approval."

¶ 55    Because the court did not find any facts regarding borrowers'

reliance — nor could it have at the summary judgment stage — but

based its conclusion on documentary evidence alone, its decision is

not entitled to deferential review.  *See Colo. Coffee Bean, LLC*, 251

P.3d at 20.  Instead, we may draw our own conclusion from the

documents.  *Id.*  And we conclude that the language in the

exculpatory provision and disclosure disclaimer is not sufficiently

specific to preclude borrowers' reliance on the absence of

undisclosed negative financial information about the builder.

¶ 56    As an initial matter, the language in the disclosure disclaimer

cannot be used to undermine the reasonable reliance of the two

borrower couples that did not sign that document.  But we

recognize that the exculpatory provision includes similar language

"assum[ing] the Borrower has performed a diligent investigation of

the Builder," so we consider the language collectively.

¶ 57    Even so, neither cited provision, nor the integration clause,

expressly disclaims reliance on lender's failure to disclose material

information.  *See id.* at 21.  True, the exculpatory provision provides

that lender's "approval of the Builder is for [its] sole benefit," and

the disclosure disclaimer provides that borrowers "should not rely

36

on [lender's] satisfactory review of the builder." But under the circumstances, where lender allegedly made misleading representations about its investigation and approval of builder, this contractual language is not specific enough to preclude borrowers from relying on the assumption that the facts lender allegedly knew and concealed about builder's precarious financial position did not exist or were different from what they actually were. *See id.* at 17.

¶ 58 The court also noted that one borrower couple asked lender for the results of its evaluation and the request was refused, "such that they knew and accepted that information was not being shared with them." Even assuming this is an undisputed fact, it does not alter our analysis. Being told that information will not be provided is not the same as being discouraged from relying on reasonable inferences drawn from lender's representations about builder's finances and assuming contrary facts did not exist. *See id.* at 20-21 (noting that although the trial court found that the plaintiffs had been told certain information was not being disclosed, it did not find "that plaintiffs had been discouraged from relying on inferences concerning [the information]"). Thus, we conclude that the loan

agreement does not, as a matter of law, undermine the reasonable reliance element of borrowers' fraudulent nondisclosure claim.

## C. Disputes of Fact Regarding Lender's Affirmative Misrepresentations

¶ 59    Borrowers contend that the district court erred by weighing disputed facts to find that lender made no affirmative misrepresentation and by entering summary judgment against them on that basis.  We agree.

¶ 60    The district court reasoned that borrowers' allegation that lender "falsely represented to [borrowers] that [builder] was an 'approved' builder" was not true.  It found that record evidence demonstrated that builder was, in fact, "approved" by lender for borrowers' loans.  As a result, the court concluded that any claim premised on this alleged misrepresentation failed as a matter of law.

¶ 61    But the evidence borrowers submitted in opposing lender's motion for summary judgment was not so limited.  True, the evidence showed that lender represented to borrowers that builder had been "approved."  But, viewed in the light most favorable to borrowers as the nonmoving party, *see Rocky Mountain Planned Parenthood, Inc.*, ¶ 20, the evidence also showed that lender made

other representations that were at best misleading or at worst false based on information lender had about builder at the time. *See Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 48 ("A 'false representation' is defined as any words or conduct that creates an untrue or misleading impression of the actual past or present fact in the mind of another.").

According to borrowers, lender represented that

- builder had been through an "extensive background check" or an "elevated financial review";

- builder was a "preferred" builder in "good standing" with lender, and selecting him would be viewed by lender as a positive in its decision to make the loan, would streamline the application process, and would allow the loan to close quickly; and

- builder had been approved for five projects at once — more than the number of projects lender typically approved — "based on his financials and progress on existing projects."

And lender made these representations even though

- lender was concerned about builder's spending habits;

- builder had "past issues," including not paying subcontractors and getting "hosed" on a recent project, and lender was giving him "a second chance";

- builder told lender his "financials [were] terrible";

- builder's financials were not sufficient to approve him for five projects under lender's internal guidelines, but lender nevertheless approved him; and

- lender modified builder's financials in order to approve him.

¶ 62    Notwithstanding this evidence, the district court found that lender's representation that builder was approved "based on his financials" was not fraudulent based on its review of the deposition testimony of a lender representative. When asked whether the "based on his financials" part of the statement was true, the representative answered, "[I]t is not." The court explained that the witness "simply agreed with a statement by counsel characterizing the underlying facts but without stating them" and that the court's review of the surrounding testimony "did not reveal a discussion of actual facts that rendered the statement false."

¶ 63    But whether the court is persuaded by the evidence is not the relevant inquiry at the summary judgment stage. *See Andersen v.*

40

*Lindenbaum*, 160 P.3d 237, 239-40 (Colo. 2007) ("At the summary judgment stage, the trial judge's function is not to weigh the evidence and decide what occurred," nor should it "determine which evidence is the more credible."). The material facts — what lender knew and when and what it represented to borrowers — were in dispute. The court was not permitted to resolve conflicts in the evidence against borrowers. *See id.* Consequently, the court erred by entering summary judgment on this basis on borrowers' claims for fraud, negligent misrepresentation, violation of the CCPA, and unjust enrichment.

### D. Credit Agreement Statute of Frauds

¶ 64 In addition to resolving borrowers' claims on the bases already discussed, the district court also "approve[d] and adopte[d]" lender's argument that the credit agreement statute of frauds (CASF), § 38-10-124, C.R.S. 2025, barred all of borrowers' claims. Borrowers contend that the court erred by granting summary judgment on this alternative basis. We agree.

### 1. Standard of Review and Generally Applicable Law

¶ 65 We interpret the CASF de novo, giving effect to the legislature's intent as reflected in the statutory language itself and interpreting

41

words and phrases according to their commonly accepted meaning. *Schoen v. Morris*, 15 P.3d 1094, 1096-97 (Colo. 2000).

¶ 66 Under the CASF, "no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." § 38-10-124(2). A "credit agreement" is

> (I) A contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation;
>
> (II) Any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any . . . credit agreements . . . ; and
>
> (III) Any representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any . . . credit agreements . . . .

§ 38-10-124(1)(a).

¶ 67 The legislature enacted the CASF "in an effort to discourage lender liability litigation and to promote certainty [in] credit agreements." *Norwest Bank Lakewood, Nat'l Ass'n v. GCC P'ship*,

886 P.2d 299, 301 (Colo. App. 1994); *see Schoen*, 15 P.3d at 1098

(the CASF was enacted "to curtail suits against lenders based on

oral representations made by members of the credit industry"). The

statute applies broadly to any type of claim, including tort claims

for fraudulent or negligent misrepresentation, relating "to a

purported agreement, negotiation, representation, or promise that

assertedly amends, cancels, or waives any terms or provisions of a

previous credit agreement." *Norwest Bank Lakewood*, 886 P.2d at

302; *see Schoen*, 15 P.3d at 1099 ("[T]he statute bars not only

contractual claims, but also claims in tort arising from an oral

credit agreement.").

2.  The District Court Erred by Concluding that the CASF Barred
    Borrowers' Claims

¶ 68     To be sure, borrowers' action relates to a credit agreement

involving a principal amount that exceeds twenty-five thousand

dollars. *See* § 38-10-124(2). But it is undisputed that the loan

agreements are in writing and signed by the parties. As a result, by

its plain language, the CASF's prohibition against the filing of a

claim relating to such a credit agreement does not apply. *Id.*

¶ 69 Nevertheless, in its motion to dismiss and its motion for summary judgment, lender argued that borrowers' claims sought to rewrite the exculpatory provision to provide that lender's approval of builder was for borrowers' benefit rather than solely for its own benefit. Lender also argued that the CASF barred borrowers' claims because lender's allegedly false or misleading representations and nondisclosures regarding builder were made during negotiation of the loan agreements. The district court adopted these arguments as an alternative basis on which to enter summary judgment. In so doing, the court erred.

¶ 70 We reject lender's argument that borrowers' claims seek to rewrite the loan agreement to alter the language of the exculpatory provision providing that lender's approval of builder is for its sole benefit. That argument is premised on a characterization of borrowers' claims that we have rejected.

¶ 71 Although the CASF applies to "oral promises or representations made during negotiations to modify or vary the terms of" a credit agreement, *Norwest Bank Lakewood*, 886 P.2d at 302, borrowers do not seek to enforce any oral promises or to modify the terms of the loan agreement based on lender's

representations. Nor are borrowers seeking recission of or to avoid their obligations under the loan agreement based on lender's representations and nondisclosures. *Cf. Premier Farm Credit, PCA v. W-Cattle, LLC,* 155 P.3d 504, 515-16 (Colo. App. 2006) (a claim does not have to seek affirmative relief to be barred by the CASF; a fraudulent inducement claim seeking to avoid foreclosure of security based on a promise to forbear from declaring a loan in default falls within the statute's scope).

¶ 72    Indeed, the representations lender is alleged to have made — essentially, that builder was approved for extra projects based on his financials after an extensive background check — are representations of fact. They are not promises, undertakings, offers, or commitments that can be enforced, and they are not representations about the credit agreement itself. *See* § 38-10-124(1)(a), (2); *cf. Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1228 (D. Colo 2010) (claims based on bank's promise to offer financing based on inflated property value were covered by CASF); *Schoen,* 15 P.3d at 1097 (bank's assurances it would approve and fund a loan so that debtor could pay off other loans constituted a credit agreement); *Univex Int'l, Inc. v. Orix Credit*

*All., Inc.*, 914 P.2d 1355, 1356 (Colo. 1996) (proposed terms for financing the purchase of machinery securing a loan constituted a credit agreement); *Pima Fin. Serv. Corp. v. Selby*, 820 P.2d 1124, 1127 (Colo. App. 1991) (credit agreement definition includes settlement agreement that would have canceled or waived an original credit agreement).

¶ 73    Although the CASF has been interpreted broadly to preclude all types of claims, we are unaware of any authority holding that it reaches so far as to preclude claims based on precontractual misrepresentations of fact that, although made by a creditor to a debtor, do not implicate the terms or enforcement of a credit agreement.  And we decline to extend the CASF that far today. Accordingly, we conclude that the district court erred by granting summary judgment on this alternative basis.  *See Westin Operator*, ¶¶ 19, 21 (summary judgment is only appropriate when applicable legal standards are clearly satisfied).

## IV.    Disposition

¶ 74    We affirm the district court's entry of summary judgment on borrowers' negligence claim but reverse the entry of summary judgment on borrowers' claims for violation of the CCPA, fraud,

46

fraudulent concealment, negligent misrepresentation, unjust enrichment, and civil conspiracy. We remand the case to the district court for further proceedings consistent with this opinion.

JUDGE FOX and JUDGE MEIRINK concur.